## BELKNAP vs. TRIMBLE and others.

Where the complainants were the several owners of different mills situated upon the same stream, which mills depended upon a particular use of the waters of a pond at the head of the stream for the running thereof, and as such mill owners had been in the uninterrupted use and enjoyment of the water in a particular manner for more than twenty years; *Held*, that the court of chancery had jurisdiction to establish their right to such use of the waters of the pond, and to restrain the defendant from disturbing them in such enjoyment thereof.

The exclusive enjoyment of the use of water in a particular way for twenty years is sufficient to raise a presumption of title to such use; and it is not necessary that the water should have been used precisely in the same manner or to propel the same machinery.

If the proprietor of land at the head of a stream changes the natural flow of the water, and continues such change for twenty years, he cannot afterwards restore the flow of the water to its natural state to the injury of the proprietors of mills situated on such stream.

Where different mill owners have a common right to an artificial use of water for their respective mills, the court of chancery has jurisdiction so to regulate the common use of the water as to preserve the rights of each.

The omission of the court below to award an issue to settle a disputed claim of right between the parties is not a ground of appeal, if neither party asked for such issue on the hearing of the cause.

October 22.

THIS was an appeal from a decree of the late equity court of the second circuit. The respondents are the separate owners of several mills, and milling establishments, situate upon a stream of water called the Quassaick creek; it being the outlet of the Great Pond in the county of Orange. They filed their bill in the court below, against the appellant, to establish their right to certain artificial works at the head of the stream, by which works the surplus waters of the pond were retained, for the use of the mills below, until the dry season commenced, and were then let out in such quantities as to keep the mills in operation during such season of drought. The court below established the right of the complainants to this artificial use of the waters of the pond and stream, and restrained the defendant, by a perpetual injunction, from interfering with that right. From that decision the defendant appealed to this court. The following opinion was delivered by the circuit judge, in the court below.

EMOTT, Circuit J. The bill states, that the plaintiffs are the owners and occupants of several mill lots and mills on Chamber's creek, being the outlet of the Great Pond, and emptying into the Hudson near Newburgh, and that their mills and mill seats are chiefly valuable on account of the benefit and use of the waters of the pond, and of a dam and fall at the outlet. That the pond has an elevation in its natural state, above the land below, of about 18 feet from the surface of the pond to the surface of the outlet of such low lands at the distance of 70 rods from the pond, and that the average depth of the pond is about 13 feet. That in 1783, Thomas Matchin cut a canal a little to the east of the natural outlet of the pond and extending a considerable distance, and erected thereon, about 70 rods from the pond, a copper-mill, saw-mill and grist-mill ; and by erecting a dam across the natural outlet, turned the water of the pond into the ditch, for the use of the mills. The copper-mill and saw-mills were soon abandoned, and have gone to ruin, the grist-mill has been suffered to go wholly out of repair, and has not been used for any milling purpose for more than two years. That the plaintiffs, and those from whom they derive title, have for more than twenty years, without opposition, hindrance or claim to the contrary from the owners of the mills built by Matchin, in seasons of drought, and whenever the waters of the pond became low and run out in small quantities, claimed and exercised the right to go to the outlet and cut down and deepen the same so as to cause a flow of the waters for the use of the mills, and also to erect a dam ·and gate across the outlet for the preservation of the waters in the pond, and for controlling the discharge thereof in such prudent quantities as the exigences of the mills below the outlet required. That for the more beneficial use and efficient application of the· waters of the pond to the mills below, the outlet has been cleared from time to time, and cut down and graduated from the pond to the low land, and a dam put up and sustained · across the outlet of the pond with a gate for the purpose of preventing too great a discharge of water and a loss thereof in time of freshets, and to give vent to the water in time of droughts, so as at all times to furnish the mills below with a

sufficient quantity of water for the equal use and benefit of the owners of the mills on the stream. That the pond has immemorially served as a reservior for the supply of water for the use of the mills on the stream, and that the artificial improvements have been substantially in their present state for more than twenty years; and that the mill owners below have from time to time contributed their labor in making and keeping up the improvements with a view of securing to the mills below the more beneficial use of the waters of the pond. The bill states that the defendant now claims that he is the rightful owner of the outlet, with the dam and gates erected thereon, and can control them according to his own will and pleasure, and against the will and consent of the mill owners below, and that he, in pursuance of his pretended claims, threatens and intends to take up and fasten down the gate so as to control and manage the said gate and the head of water, thereby acquired; and it charges that the defendant at sundry times in the month of September and October, spiked and nailed down a large plank upon the dam, so as to prevent the water from flowing over the dam, and also spiked and fastened down the gate so as to prevent the plaintiffs from using the gate and waters for their mills. , And the bill prays to have the rights of the parties established, and that the plaintiffs may be quieted against the defendant in their just claims to the stream, outlet and dam.

The defendant in his answer, in substance, admits the case made by the plaintiffs, so far as relates to the mills, their location and occupancy, and to the pond and stream, and the necessity of the latter to the beneficial possession of the former. He denies, however, that the artificial improvements have been substantially in the same state in which they now are for 20 years, or that they have been made or maintained by the mill owners below. He gives this account of the improvements: He says, that Matchin, in his own right, or as agent or the owner of the lands at and including the outlet, erected a copper mill and saw mill on the creek about 70 rods below the pond, and such mills going down, a grist mill was erected in their stead ;· that Matchin, at his own cost, or that of the owners, whom he represented, aided by the voluntary and oc-

casional labors of the persons residing in the neighborhood who felt an interest in maintaining the mill, cut down the outlet, and erected a dam, so that the waters could be maintained at the greatest natural elevation, and by means of a gate could be drawn off as the mills required ; and to direct the water into the race-way leading to the mills, he threw up a small dam of stone and gravel across the creek just below the junction of the race-way with tne creek.    These improvements were kept up by Matchin and those who succeeded him in the mill, assisted by the voluntary labors of their neighbors, feeling an interest in the mill, substantially in their original state, until about 1811, or 1812.    The defendant says that Chancey, Thomas, and Daniel Belknap, having about this time become owners of the premises, they removed the dam at the outlet of the pond, and erected a new and substantial dam at or near the spot, down the creek, where the old dam of stone and gravel had been placed to turn the waters of the pond into the race-way leading to the mill.    The new dam was of a height to give the waters of the pond the same elevation as the dam which had been erected at the margin of the pond, and it had attached to it a floom and gate to regulate the passage of the water into the race leading to the mill.    These improvements the defendant alleges were made by the Belknaps at their own proper cost, and for their own benefit and advantage, and were so maintained by them until about the first of October, 1821, when they conveyed their mills to the Newburgh bank.    The Belknaps, while they owned and occupied the premises, cleared out and sunk the outlet from time to time, to about three feet ; in doing which they were assisted by the plaintiffs, Trimble, Walsh, Dubois and others, occupying mills on the stream, and by their neighbors, taking an interest in such mills.    This assistance consisted of voluntary and occasional labor in times of great lack of water, by the permission and under the direction of the Belknaps, and not in their own right or by their own authority, real or pretended.

The defendant says, that after the Belknaps conveyed to the Newburgh bank he occupied the premises under the bank as a tenant ; and that he, in conjunction with the complainants, Walsh, Dubois and Trimble, and with Daniel Rogers and

David Belknap, also mill holders on the creek, sunk the outlet about two feet for fifty rods or upwards, at a considerable expense. This was done by the permission of the defendant, at their own request, and not in their own right, real or pretented. The defendant in his further answer admits that he has not as owner or occupant, any mill in use or operation upon the outlet, or any part of the stream. He admits that he claims to be the rightful owner of the outlet with the dam and gate; and he further admits, that by the removal of the dam or gate, or keeping the latter closed in times of drought, or to destroy, or reduce the fall and the present head of power of the waters, the advantage thereof would be entirely lost, or materially diminished to the plaintiffs. The defendant also admits that in September and October he nailed down a plank upon the dam, so as to prevent the water from flowing over the same, and fastened down the gate so as to prevent the plaintiffs from using the gate for the benefit of their milling establishments; and further, that as often as the plaintiffs in the said months raised the gate, he closed the same, and he denies that they had any legal or equitable right to open the gate and draw off the water.

In this analysis of the bill and answer, I have taken no notice of the allegations about the title to the outlet, as such title can be better made out from testimony. The paper title, as I have it before me, will explain and give color to the parol testimony. I proceed in the first place to examine it. The first deed produced is from Thomas Beaty to Munson Ward, dated the 5th of January, 1779, for 108 acres, adjoining the pond on both sides of the outlet, and of course including it. On the 20th of March, 1782, Ward conveyed to George Clinton, and as the pleadings shew, Matchin went into possession in 1783, erecting mills and making the first improvements at the outlet. It must of course have been under Clinton. On the 28th of October, 1793, Clinton conveyed to Daniel Byrns and Hugh Walsh; and it appears from a paper which I am next to notice, that Walsh conveyed his moiety to Byrns, on the 16th of May, 1797.

1832.

Belknap
v.
Trimble.

On the 20th day of May, four days after the giving of the last deed, a conveyance was made by Daniel Byrns to Hugh Walsh and Daniel Niven, reciting the conveyance of the 16th of May, and that it was the meaning of the parties that an equal half of a certain water course or run of water, called the outlet of the Great Pond, and the one half of the land lying adjoining to the said water course, on each side thereof, extending to the distance of twenty five feet on each side, and down along the same to the line of the land conveyed, should have been excepted ; and it being doubted whether the exception had been duly made, to remove such doubts, Byrns conveyed in fee to Walsh and Niven the half of the water course and the strip of land adjoining the same.   On the 22d of May, 1797, Byrns conveyed to John Vanduzer an undivided half of the 108 acres, excepting thereout the stream called the outlet of the pond, and the land extending to the distance of twenty five feet on each side of the stream.   On the next day, the 23d of May, Byrns conveyed to Vanduzer an undivided fourth of the outlet, and of the land adjoining the same, to the distance of twenty-five feet on each side ; which water course, it is said, is intended in part to supply the mills of Vanduzer with water.   The stream and the small strip of land appear thus to have been intentionally separated from the larger part, for milling purposes, and to have been vested in part in persons having an interest in the large tract. On the 23d day of May, we thus find the outlet, with twenty five feet on each side, to the outer bounds of the 108 acres, legally vested in Daniel Byrns, Hugh Walsh, Daniel Niven and John Vanduzer, in equal parts, as tenants in common.

On the 20th day of May, 1797, Byrns and Vanduzer mortgaged to George Clinton the 108 acres, excepting the water course with the 25 feet on each side ; and the mortgage having been foreclosed in chancery, Gilbert Livingston, on a master's sale, conveyed the 108 acres, subject to the exception, to Robert W. Jones, on the 22d of November, 1800 ; and Jones, on the 6th of April, 1802, conveyed to Hugh Walsh, making the same exception.   On the same day, the 6th of April, Walsh conveyed to Gilbert Jones 200 acres, including this 108 acres, without making any exception.   And as Walsh

then owned an undivided fourth of the outlet, the conveyance legally included such fourth of the outlet, but no more. At the end of this deed, and after the signature of the grantee, is added, of the same date and witnessed by the same persons, a clause signed by the grantee, commencing thus : " Provided always, and it is the true intent and meaning of the parties," &c. and declaring it shall be lawful for Daniel Niven and Hugh Walsh, them and each of their heirs and assigns at all times to dig, widen and deepen the present water course into the pond to the floor of the floom of the grist mill of Jones, so as to be on a water level from the said floor to the pond, and also to have the privilege in a scarce time of water to hoist the gates of the pond and let the water run, at any time after it has been shut up for more than 12 hours, to the damage of Niven or Walsh, or their or either of their heirs or assigns, and to keep the same open after every such shutting in a scarce time, also 12 hours for the accommodation of the mills of Niven and Walsh. The administrator of Jones conveyed the 200 acres, without exception of any kind, to Chancey, Thomas, and Daniel Belknap, on the 19th of April, 1809, and they, on the 1st of May, 1809, mortgaged to George Clinton 35 acres at and including the outlet, and extending about seven chains on both sides of the outlet. The administrator of Clinton, on the 30th of May, 1824, assigned the mortgage to the defendant ; and on the 18th of February, 1825, the sheriff, under an execution against Chancey and Daniel Belknap, conveyed to the defendant the pond lot of 80 acres, bounded on the pond and covering the outlet. We have the title of the defendant to the outlet, under which, as he states in his answer, he claims to be the rightful owner of the stream, and dam and gate, with power to close the gate permanently, thereby stopping any flowing of the waters from the pond except when it is high, and thus depriving the mills below of the beneficial use of the water, rendering them useless in the dry seasons of the year. His right to the outlet and the twenty five feet on each side of it is at best but an undivided fourth, and that subject to the privileges secured to Walsh and Niven in the instrument signed by Jones, and which is annexed to and accompanies his deed. For notwithstanding the in-

strument in its details was questioned and much criticised on the argument, yet in a court of equity it must be deemed as binding and operative according to its tenor and intent; as it is a valid grant for a fair purpose.

The defendant has a small foundation on which to rest his formidable claim; and should he even succeed in his controversy with the plaintiffs as mere mill owners, he will have to meet some of them, as well as others, as co-tenants with him in the dam and outlet. The plaintiffs in their bill allege that they are the occupants and owners of mills on the stream; and it will be well here to inquire how far they have made out this part of the case. The first person named in the bill is Richard Trimble, and he has shewn two conveyances to himself. The one from the assignees of Caleb Byrns, of the 6th of February, 1801, for property on the south side of the creek; and the other from George Gardner, of the 20th of June, 1801, for a lot on the north side of the creek. From the testimony of Jacob Schultz and Isaac Belknap, it appears that the mill on the south side of the stream was built by George Clinton and Isaac Schultz many years since; and Jacob Schultz in particular testifies that the mill was put up in 1784 in the place of one burnt down, and which was an ancient one. The mill of 1784 has been continued to the present day, and has been occupied by Trimble ever since his purchase in 1801. The mill on the north side of the stream was built by Trimble soon after his purchase from Gardner. The next person in the bill is George Reid, who produced a deed from the executors of Robert Boyd, of the 21st of March, 1822; and the title is carried back to 1784, by a deed from Henry and Thomas Smith to Boyd. Reid's erection is a paper mill; and from the testimony of Belknap and Schultz, the property has been used for milling purposes as far back as they can recollect, which is nearly half a century. John H. Walsh, the next person named, produced a conveyance from Hugh Walsh of the 9th of August, 1808; he occupies a paper mill which the same witnesses say was built by Hugh Walsh and James Craig upwards of thirty years since. Nathaniel Dubois, the next plaintiff, produced a conveyance from John Dickerson of the 18th of June, 1807, and his title is carried back to the 3d of May, 1753, from Alexander Colden to

Jonathan Hasbrouck for 100 acres of land with a grist mill. The witnesses concur in saying that Dubois' mill has been kept up ever since they can remember, and that it was an old mill when they first knew it.

The other plaintiffs, Abraham M. Smith, William L. Smith, Matthias G. Miller, James Halstead and Charles Halstead claim under a master's deed on a foreclosure in chancery on a mortgage given by Chancey Belknap to William Edgar, on the 1st of July, 1809. The master's deed is to William. L. Smith and James Halstead, of the 2d of June, 1824, for the consideration of $18,000. The mills possessed by these plaintiffs are of great extent and value, and were principally put up by the Belknaps in 1803, on the place of other mills. The plaintiffs have thus made out that they are the owners and occupiers of ancient mills on the stream issuing from the pond, and it remains to be considered whether the defendant, by nailing down the gate and assuming the control of the waters of the pond to the great and acknowledged damage of the plaintiffs, has not acted in violation of their rights. It may here be as well to dispose of an objection to the jurisdiction of the court, which was strongly and confidently urged on the part of the defendant at the hearing. It is contended that the relief is at law; the act of the defendant, if he had no right, being a mere trespass. These objections to the jurisdiction generally come too late at the hearing. When the parties have submitted themselves to the court, and with trouble, labor and expense have prepared the cause, the reasons must be powerful indeed which will induce or even authorize the court to turn the parties round to a renewed litigation. In this case, however, I do not feel that the authorities cited, and which I have attentively examined, make it necessary for me to inflict this punishment on the parties; for thus it would be, if they were sent to begin this controversy again at law—the cases being of trespasses, properly so called, which could be better tested and settled at law than in equity; and the most of them decided on motion for an injunction on the filing of the bill. This, however, is the case of a private nuisance, and comes so distinctly and directly within the decision and reasoning of Chancellor Kent, in

the case of *Gardner* v. *The village of Newburgh*, (2 *John. Rep.*
162;) that I may safely place myself on that case. The chan-
cellor is fully borne out in his declaration, that the court has a
clear and well established jurisdiction, by injunction, in cases
of private nuisance in diverting streams. And to the authori-
ties cited by him, I may add that of *Robinson* v. *Byron*, cited in
1 *Ves. jun.* 428. In that case the plaintiffs had a mill to which
the waters flowed from the park of the defendant. The defend-
ant let down the water upon this mill, upon which the bill was
filed, to prevent the water from flowing otherwise than it did
before.; and an injunction was granted in the first instance,
on affidavits. The interference of a court of equity in cases
of this kind is demanded and justified by the strongest con-
siderations of public as well as private convenience ; and if
this was a case of the first impression, I should feel myself
warranted in asserting and maintaining the jurisdiction of the
court, not certainly in contradiction of, but notwithstand-
ing the decision about trespasses. We now come to the in-
quiry whether the plaintiffs have made out that they and
their predecessors, owners of ancient mills on the stream be-
low, have been accustomed for more than twenty years to
use and enjoy the water issuing from the pond by means of
the works at the outlet. If this has been made out, then the
plaintiffs will be entitled to be relieved ; as it is now fully es-
tablished, that where a person has used and enjoyed an ease-
ment for twenty years and upwards, though it was a wrong-
ful user at first, he thereby gains a right. (2 *Saund.* 175, *note*
2.). Nor is it necessary that the proof on the part of the plain-
tiff should stand uncontradicted. This court, when a fact is
to be established, has a right to examine the testimony and
decide according to its opinion of the weight of evidence.
Without such power, a court of equity would in most cases
be a closed court, as it rarely happens that a cause, in which
there is a controversy, is carried through without opposing tes-
timony. The case of *Finch* v. *Resbridger*, (2 *Vernon*, 390,) is
strong to the point as applying to this dispute. The bill was
to quiet the plaintiff in the enjoyment of a water course to his
house and garden through the ground of the defendant. It
appeared upon the proof that there had been a long enjoy-

ment of a water course, particularly by the Earl of Arundel, and after him by the Duke of Norfolk ; and that the plaintiffs had scoured and repaired it when there was occasion,' and that the Duke was in quiet enjoyment when he sold to the plaintiff. For the defendant, it was insisted that the Earl, in 1662, less than forty years before the suit, took a long lease of the land ; and that while he held the land, he made the water course, and that after the expiration of the lease, he was many times denied liberty to scour or amend the water course, and several witnesses deposed to that effect. Lord Chancellor Somers, on the hearing, directed an issue to try whether there was any agreement for the making or continuing of the water course. But upon a re-hearing, Lord Keeper Wright decreed for the plaintiff; declaring a quiet enjoyment the best evidence of right, and that he would presume an agreement. And said that it lay on the other side to shew a licence, or that the right was to be restrained or limited in point of time.

We now proceed to the testimony in the cause. Samuel Weed, a witness for the plaintiff, testifies that he remembers when the dam and gate at the pond were first built. Matchin lived at the outlet at that time, and he helped put in the dam and gate as did the owners below. David Belknap, another witness for the plaintiffs, testifies that Matchin was the first person that he recollects in possession of the mill at the pond. The gate at the pond, he says, was put in for the purpose of stopping and restraining the water for the benefit of mills below in dry times. Weed also says that the mill owners below were in the habit of sending hands from all the mills to dig down the outlet ; and Matchin said they had a right to come and hoist the gate for water when they pleased. And they have continued to do so, and to dig down the ditch without interruption until the late interference of the defendant. He says Thorn and Dickerson, when they occupied the mills of Dubois, frequently sent hands to dig the outlet ; and Trimble sent hands after he came to his mill. Gilbert Jones, under whom the defendant claims, when he was on the lot, told the witness that the mill owners below had a right to come and dig and command the water ; and they used to send

to the witness to open the gate, and he always did it to let the water down for their benefit. · The witness himself was interested in a saw mill on the stream, and when he wanted water, he always went up and hoisted the gate himself, and it was not objected to by Matchin or Jones. He exercised the same right when Byrns and Vanduzer had possession, and they also said that the people had a right to the water. Belknap, in confirmation of this, also testified that he has known the owners of the mills below to come up and dig the outlet, and they have been in the habit ever since he can remember, of coming and digging and drawing off the water, before Chancey Belknap built his mill. He usually worked with them and never knew the owners of the land to forbid or interrupt the digging, though the house was close by the outlet. The witness knows that the mill owners below went up to the outlet and dam one season while Vanduzer was there, as they did in Jones' time. · They did the same during the occupancy of Sevine and Hull and Chancey Belknap, and this witness went frequently at the intimation of Belknap.

Jacob Schultz, another witness for the plaintiffs, testified that in 1795, his father, who owned the mill near the river, sent him with other hands, in company with persons employed by Craig and Walsh, to the outlet to dig and sink it so as to increase the discharge of water from the pond for the benefit of the mills below. They dug down and deepened the outlet considerably; the persons in possession of the mill at the outlet making no objection to it. Hector Craig says he, by the direction of his father, who owned part of the paper mill near the river, went with Schultz to dig at the outlet, and that his father was there assisting and giving directions. John Vanduzer, also a witness for the plaintiffs, and who was the owner of the 108 acres at the outlet with Byrns in 1797, testified that he possessed the property at the pond as owner for four years from that year, and had occcupied it as a tenant for a year, about the year 1794. In the latter year, the hands of Byrns, Walsh and Niven, who were owners of mills on the stream, dug down the outlet and were at work two or three weeks. The outlet was lowered three or four feet, and it was dug along for thirty or forty rods.

The witness always understood, while he was owner of the property at the pond, that the mill owners below had a right to come there and dig down the outlet for the use of the water.   Robert Lockwood, another witness, says that he has lived near the great pond the most of his life, and is now fifty-five years old.   When he was eighteen years old, he lived with Gardner and tended his saw-mill on the stream.   Gardner, he said, always claimed the right to let out the water from the pond ; and when he wanted the water, he and his hands by his orders went and raised the gate.   The witness never knew the right disputed by Matchin or any one else.   And James Belknap, a further witness of the plaintiffs, testified that his father was one of the firm of Chancey Belknap & Co.'; that in the summers of 1814 and 1815, or 1816, for two years in succession, all the mill owners below assisted in digging down the outlet.   The mill owners below enjoyed the benefit of the waters.   He thinks he went to them, by the direction of Chancey Belknap, to come and assist in digging ; and he says that no person within his knowledge ever sent men to dig, except those who were interested in the mills below.   With respect to the improvements at the outlet, in 1822, which, it will be recollected, the defendant in his answer says were put there while he was a tenant of the Newburgh Bank, and were made by his permission or request, and not by any claim of right in the mill owners below, we have this account : Joseph Haines, a witness for the plaintiffs, says that he is a carpenter, and that in the fall of 1822 he put in the new dam and gate at the outlet.   He was employed and paid by the plaintiffs, Walsh and Dubois.   Walsh furnished the plan or draft of the work, and gave directions about doing it ; and Walsh, Dubois and Trimble took turns in superintending the work ; and some or one of them was there every day.   The dam and gate were put down in the same place where they last stood.   The work occupied eight or ten days, and the defendant aided in the work about two days.   David Munn says that he was employed in 1822 by Walsh to dig down the outlet ; the work was done by the job, and ten or fifteen other men labored for more than a week in digging the ditch ; he began at the lower gate,

1832.

Belknap
v.
Trimble.

and dug up to the gate at the pond; the outlet that season was sunk about two feet. When he commenced digging, the outlet was lower than the raceway to the old mill, and he sunk it deeper still. The work was done for the plaintiffs, Walsh, Trimble and Dubois, and for the defendant, who assisted in the digging; and it was commonly talked of among the parties at the time, that what was done was to be for the benefit of the mill owners below. The defendant at the time said that he ought not to do as much as the other millers, because they would have the benefits of the improvements always, and he had his mill for a short time only on lease. David Belknap says that the present dam and gate were built entirely new in 1822, and that a great deal of work was done that year in the outlet. The outlet was sunk two feet and a half lower than the race-way to the old mill; and it was six inches lower at the time the plaintiffs, Trimble, Walsh and Dubois, and the defendant assisted at the work. The defendant called on witness to contribute his part of the expense, and he paid twenty-five dollars, besides having furnished considerable timber for the dam and gate. The defendant said that he was assessed by the mill owners below, for the expenses of the work, higher than he ought to have been, as he was only a tenant for a year, and they would have the use of the water forever.

We thus have testimony, and as much and as strong as could be expected of a thing which happened more than forty years ago, not only that the mill owners below aided in putting up the first artificial works at the pond, but that they were made principally for their benefit; for so says Belknap and Weed. We find the mill owners, from this time to the very period of the interference of the defendant, and for more than forty years, constantly resorting to the pond for water, when they needed it, scouring and altering and improving the outlet, without the permission of any one, or without the denial or disturbance of any one. In the time of Matchin, Weed says they managed the outlet as they pleased, and Matchin declared that they had a right so to do. He also testifies that Byrns and Vanduzer, in their time, admitted that the owners below had a right to the water, and permitted them to dig at the outlet and to draw off the water; and that they did so ap-

pears abundantly from the testimony of Schultz and Craig, who, in 1795, actually dug at the outlet to increase the discharge of water from the pond, for the benefit of the mills below, under the direction and superintendence of the owners of the mills below. Vanduzer, the owner with Byrns, was himself examined, and spoke of possessing by him, as tenant and owner, pretty much from 1794 to 1801 ; and he can neither be mistaken nor misunderstood, when he says that during his time, the mill owners below claimed the right of working at the outlet and drawing off the water ; and that he, as owner of the land near the pond at the outlet, recognized such right. Weed says that Gilbert Jones, under whom the defendant derives title, and who was in possession as owner from 1802 until his death, about the year 1807, allowed the mill proprietors below to let off the water of the pond, and said that they had a right to come and dig and command the water. After Chancey Belknap and his brothers became the owners of the land at the outlet, it appears from the testimony of James Belknap, a son of one of the firm, that the mill owners below assisted in digging down the outlet for two years in succession ; and if they cannot be found, during the occupancy of the Belknaps, in letting out the pond, it is probably because there was an almost uninterrupted flow of the water, as the Belknap mills were extensively engaged in flouring, and were kept going, as Chancey Belknap himself says, generally night and day.

In 1821 the Belknaps failed, and in 1822 we find the mill owners below, on their own plans and with their own means, making alterations and putting permanent works at the outlet, not only with the assent of the defendant in possession at the pond, but aided by him according to the assessment of the owners below. No dissent to their improvement appears, or is pretended by any one.

If I am not allowed to say this makes out a conclusive case of an enjoyment of an easement for twenty years and upwards, it at least makes out a strong case to presume an agreement. And as Lord Keeper Wright says in *Finch* v. *Resbridger*, (2 *Vernon*, 391,) "proof must come on the other side

to show the special licence, or that it was to be restrained or limited in point of time."

The defendant has produced some proof, and to that we shall now attend. The first witness for the defendant was Joseph Hallock. He says he lived in the neighborhood of the pond while Matchin was there, and was once employed by him in his saw-mill three or four months. Matchin used to draw the gate at the pond when he wanted water at his mills. Vanduzer and Byrns were in possession after Matchin, and they used the water in the same manner as he did. Doctor Jones came in next; after him, Serine; and as far as he observed, the gate was kept shut when the mill was not running. He also says, that when he was employed by Matchin and Vanduzer, it was the season for sawing when the waters were high, and he does not know how the waters were used in seasons of drought. This last declaration of the witness, that he had no knowledge how the waters were used in dry seasons, when they could only be required for the mills below, neutralizes his whole testimony, and when taken in connection with what Vanduzer himself says, and what is proved as coming from Matchin and Jones, it cannot be said that this witness to any extent fortifies the claim made by the defendant.

Serine says that he occupied the property at the pond for three years after the death of Jones, under his administrators, and used the grist-mill and saw-mill. He raised and shut the gate of the pond as he wanted the water. No other person ever did, or pretended to any right to do it, within his knowledge. His son Absalom was also examined; but as he was only nine or ten years old when his father lived at the pond, his testimony is of little value. The witness, it may be remembered, testified rather negatively and loosely. If he means to be understood that the water was only drawn by himself and as he wanted it, there must at least be a want of recollection on his part, as during the whole of his time Belknap's mills, just below him, were in full operation day and night, requiring and most certainly using the water in the dry part of the year, and with such use by the Belknaps, the mills below were satisfied, as they had the full beneficial use of the waters

of the pond. There was no necessity, and there could be no use of their exercising or claiming any right for this period, as they had every thing they wanted. This view of the testimony is strengthened by the circumstance stated by the witness, that at one time, when he stopped the waters while his mill was repairing, the miller of Trimble came to him to let the water run, as it was wanted below. During such time, it may be remembered, Serine had a right to stop the flow of the waters, if he could not otherwise repair his mills. The claim of the mill owners below never was exclusive, but merely of an interest in common with those above. Benjamin Gardner says that his father owned a grist and saw-mill below Matchin's, which has been down twenty-five years. Matchin used to keep the water back when it got to be low water, and would not let it run out. His father and David Belknap, who had a mill below, claimed the water because they had dug at the outlet; and he once went to Matchin, by direction of his father, and asked him to let out the water; he said the water was not coming until he was ready. When Jones was in possession, he said when the water got down to low water mark, he would let it out if he was a mind to, but none should lower it without his own consent; and the witness believes that Byrns and Vanduzer claimed the water in the same way. David Gardner, a brother of the last witness, says that he helped Matchin put in the dam and gate at the pond, and that Matchin used to hoist and shut the gate when he pleased, and that he never knew that the mill owners below, or any other person, pretended to any right to do it. · If the testimony of these witnesses establishes any thing, it is that Matchin and Byrns, and Vanduzer and Jones, living at the outlet, claimed the right to the waters and controlled them according to their will. How they controlled them has already appeared, and their rights are before the court. Matchin was a tenant to Clinton, who had a mill near the river, and who therefore never would have permitted such claim. Byrns and Vanduzer were the persons who separated the outlet from the pond property, in 1797, and conveyed half of it to Walsh and Niven. It will not be believed, after this, that Byrns and

Vanduzer claimed an exclusive right to the outlet; and we have the testimony of Vanduzer that they did not, and I have already stated Jones could not have asserted such right. The last witness, David Gardner, speaks of the occupation of the mill at the pond by one Manny, and says he got water of Manny by his consent, and that he kept it back when he pleased. The witness also says, that he sent grain to Manny to be ground, in order to have the water let out. Now it appears by a paper introduced by the defendant, that Manny went into possession in 1809, under a lease from the Belknaps, and so far from having the control of the waters, the Belknaps reserved the full command of the surplus water running from the pond; and when the water was so low that it became necessary to hoist the water-gate for water, it was to be under the control of the Belknaps; and the Belknaps also reserved a right to sink the outlet of the pond at any time, as they should see fit.

This writing may be taken as a commentary on the testimony of the Gardners, and it shews how unsafe it would be to look to them as deciding the question about the use of the privilege. Manny had not the control of the waters, nor was any application to him necessary, as the Belknaps, and through them the other mill owners, had the entire beneficial use of the pond and outlet. The defendant has examined two other witnesses, Daniel and Chancey Belknap; and it is by their testimony, if by any thing in the cause, that the defendant must establish his claim, or negative that of the plaintiffs. Daniel Belknap says that he was brought up near the outlet of the pond, and was at it in 1783. There were no improvements at the pond before Matchin came, and he controlled the waters at the pond. The witness owned a saw-mill below, and he used to go to Matchin to ask him to let out the water, who let it run, as he was not very tenacious about it. He frequently applied to the subsequent owners at the pond for the use of the water, and they were not particular about it. Chancey Belknap, on this subject, says that he knew the outlet when Matchin lived there. The second time he was at the outlet, he was sent by his father, who owned mills below, to dig in the race, Matchin having sent to his father for hands,

and fifteen or twenty men were at work. There was then a gate at the pond, and an obstruction at the outlet to turn the water into the race. The witness never heard the mill own= ers below claim a right to the water because they had assist- ed in digging. Now, without stopping to ask this last wit= ness whether he means to be understood that he never knew the mill owners below to claim a right to the water in them= selves or with others for any reason or cause, or merely that they did not set up such claim on the ground of their having aided in cleaning the outlet, I may say, that having the doc- umentary and other testimony before me, I am satisfied that Matchin never had a right to the outlet, and that neither he nor the other occupants at the pond, up to the time of the Belknaps, in 1809, which I have yet to examine, ever pre= tended to have the control of the waters, but as they were used for the joint benefit of the mills on the stream. The declara= tions and acts of Matchin and Vanduzer and Jones shew this, and the state of the paper title fortifies the proof of such dec= larations and acts. Chancey Belknap also says he never claimed the right to the water between 1803, when he and his brothers built the mills on the creek, and 1809, when they purchased the pond property ; and Daniel Belknap says that Chancey Belknap and Company, and the witness, one of the company, were in the habit, from 1803 to 1809, together with the other mill owners below, of going to the outlet and dig- ging whenever there was a lack of water ; but it was under the permission and authority of the owners of the outlet. Now who these owners were, and what was the permission given, does not appear. If they gave a general licence, without any check on their part, and for the benefit of the mills below, then, as more than twenty years have passed, and as there has been no interruption, the licence has ripened into a right. But it is a remarkable circumstance, that these very Belknaps, in 1803, built a valuable grist-mill carrying five run of stones, and a saw-mill and fulling-mill, about four miles from the pond, which derived much of their value from the pond and the waters issuing from it. It is scarcely possible to believe that these persons could have been so improvident as to have put up these mills, and engaged in an extensive business, if

they knew at the time that they were entirely dependant on the persons at the pond for their supply of water, and that such persons could at pleasure nail down the gate or destroy the dam. Daniel Belknap also says that Chancey Belknap & Co. purchased the farm at the pond in 1809 ; Manny was their tenant, and raised and shut the gate for them—in this contradicting Gardner, who says that Manny had the control of the water. The witness says that he never knew the mill owners to exercise or claim the right of opening the gate while Belknap owned the farm, but he used to invite the people to come and dig in the outlet, and the plaintiffs, Trimble, Walsh and Dubois, used to come also. Chancey Belknap says, that in 1809 he purchased the pond property, and held it till in 1821 ; and during all this time, he claimed and exercised exclusive control at the pond, and never heard a contrary claim made by any one. Soon after his purchase, he found it necessary to scour the race ; and the millers below offering to assist him, he gave them notice and they sent hands, and they usually contributed their work in lowering the outlet, but he always superintended the work. Trimble and Dubois have asked him if he was going to let more water run, but always understood it as a favor asked, and not as a right claimed. The mills kept by him were generally kept running night and day. I have already said, that if this large establishment was kept going night and day throughout the season, the mills below would be plentifully supplied, and it was not therefore necessary for the owners of such mills to resort to the pond to procure water to continue their right. And whatever opinion Belknap may have had of the title he gained by his purchase in 1809, it does not appear that he made his opinion public, or that the mill owners below recognized any new right. They, on the contrary, were always called on to assist in cleaning and sinking the outlet by the Belknaps, and always gave their aid. And when, by the failure of the Belknaps, in 1821, their mills and property had passed into other hands, the mill owners below, in 1822, at their own expense and on their own plan, sunk the outlet and put down a new dam, shewing thereby that they had not abandoned their right to the outlet, or recognized at any time an exclusive right in the Belknaps. The

possession of the Belknaps was at best, and according to their own account, but a doubtful possession; not such as to destroy or draw after it a right. But there is a further answer to be given to the testimony of Chancey and Daniel Belknap. On the 9th of August, 1814, they, with the others, filed an injunction bill sworn to by Chancey, against persons concerned in draining the Great Pond; and in it they make statements which are at war with any claim or exclusive right on their part. In this bill they say, among other things, that there are a number of mills and mill sites on the outlet, which are chiefly valuable on account of the benefit and use of the waters of the pond; that for the advantageous use of the waters of the pond, a dam has been kept up across the outlet at or near the pond, by the owners and proprietors of mills on the creek, for upwards of twenty years; that the dam was built and the outlet cleared and improved by the owners of certain mills near the river, and were intended and principally made with the view of securing to such mills the more beneficial use of the water; and that the mills at the pond were but a secondary and incidental object. With this well weighed and judicial statement, made by the Belknaps, and sworn to by one of them more than five years after they had purchased and possessed the Pond farm, and enjoyed all the rights which their purchase gave them, it can hardly be said that they deemed themselves the exclusive owners of the improvements at the outlet, or that they held themselves out to the world as having or claiming the absolute control of the waters of the pond.

Upon the whole, after the best consideration I have been able to give to this subject, I am satisfied that the plaintiffs have made out that the works at the pond and the outlet, as it has been altered and dug down within the bounds of the 108 acres tract, is an easement, which is now, and has for more than twenty years past, in whole or in part, been separated from the ownership of the farm at the pond; and that such easement has for that time been used and enjoyed by the plaintiffs and others, being mill owners on the stream, for their common benefit. It follows that the plaintiffs have a right to the interposition of the court, to be quieted against

the defendant, in the enjoyment of the easement. And I come to this conclusion with entire satisfaction to myself, as it saves much and valuable property from utter destruction, promotes the public interest, and injures no one. The defendant admits that he has no water works at the outlet or on the stream ; nor does he pretend that the pond is of any possible use to his farm. It is evident, therefore, that his purchase was made with a view to speculate, or more properly to depredate on the mill owners on the stream, by rendering their property useless, until they bought him out or made terms with him. Such views a court is sometimes obliged to wink at, for the want of power to correct them. But it would be a disgrace to any court to approbate such design ; and much more to foster and protect it.

I have thus viewed and decided the cause on the broad ground laid by the pleadings, in order that the parties may not now or hereafter be troubled as to their general rights, by any question of law which they may consider of doubtful application. Were it requisite, I think it could be shewn that the plaintiffs would be entitled to relief as the owners of water works on the stream, and whether recent or ancient, on principles of natural justice and equity of general application and acknowledged force. But I forbear going into these considerations, for the reasons I have given, and conclude by ordering a perpetual injunction against the defendant.

*G. F. Tallman,* for the appellant, made the following points :

1. The respondents are not entitled to the decree made in the court below, upon the ground of ownership of the mills down the stream, or as owners of the outlet and the lands adjacent.

2. The rights and claims of the respondents are disputed and doubtful, and a court of equity should not interfere until those rights are established at law.

3. The respondents have not shewn an exclusive and uninterrupted enjoyment of the works at the outlet for more than twenty years, so as to afford presumption of a grant, and vest in them a title to the same.

4. Feigned issues should have been awarded to try the questions of the respondents' title to the outlet and land adjacent, and of the respondents' right to the enjoyment as an easement acquired by possession.

5. The decree is erroneous in declaring and establishing an exclusive right in the respondents to use and control the works at the outlet and the waters of the pond, reserving to the appellant the use of the water for any mill he may have at the outlet; if the respondents have shown any right, it is only a right to participate in the use and control of the works as tenants in common with the appellant.

The counsel cited *Platt·* v. *Johnson,* 15 *John. Rep.* 213 ; *Merritt* v. *Brinckerhoff,* 17 *Id.* 306 ; *Palmer* v. *Mulligan,* 3 *Caines,* 307 ; 4 *Dallas,* 411 ; *Stiles* v. *Hooker,* 7 *Cowen,* 266.

*D. Ruggles & J.·Story,* made the following points for the respondents.

1. The proofs shew that the respondents and their predecessors, owners of ancient mills on the stream below, have been accustomed for more than 20 years, to use and enjoy the waters issuing from the Great Pond, by means of artificial works and erections, maintained at the common expense and for the common benefit, in a particular manner, most beneficial to their mills.

2. By such use and enjoyment the respondents, or some of them, have acquired a right to have the outlet of the pond controlled and managed for the common benefit, in the manner most advantageous to their mills, by retaining the water in the pond until the dry season, and then letting it out for the common benefit.

3. The proofs show a title to the outlet of the Great Pond, including the natural and artifical channel of the water, or to an undivided part of it in the respondents, or some of them.

4. The respondents by the purchase of their mills, acquired as appurtenant thereto, all the right to the water, and the natural and artificial channel thereof, and to the control and management of the farm, which their grantors owned and exercised at the time of their respective grants.

5. The appellant having interrupted the respondents in the accustomed use and control of the outlet, to the common injury of the respondents, the court will restrain him by injunction or otherwise.

6. The stopping and restraining the water by the appellant was a wanton and wilful injury to the respondents, without any right, necessity, or occasion therefor, on the part of the appellant.

7. No title to any part of the outlet of the Great Pond is shewn by competent evidence to be in the appellant.

8. Ownership of the land at the Great Pond would give the appellant no right to control or restrain the water in any manner contrary to its accustomed use.

The counsel cited *Hatch* v. *Dwight*, 17 *Mass. Rep.* 289 ; *Howard* v. *Robinson*, 3 *Mason's Rep.* 272 ; 3 *Kent's Comm.* 2d ed. 445 ; *Whetmore* v. *White*, 2 *Caines' Cas. in Er.* 87 ; *Strickler* v. *Todd*, 10 *Serg. & Rawle*, 63 ; *Comyn's Dig. tit. Grant, E.* 9, *Day's ed.* ; *Blaine's Lessee* v. *Chambers*, 1 *Serg. & Rawle*, 169 ; *Nicholas* v. *Chamberlain*, *Croke J.* 121 ; *Gardner* v. *Village of Newburgh*, 2 *John. Ch. Rep.* 162 ; *Belknap* v. *Belknap*, 2 *Id.* 463 ; *Hammond* v. *Fuller*, 1 *Paige's R.* 197 ; *Stevens* v. *Beekman*, 1 *John. Ch.* 318 ; *Hanson* v. *Gardiner*, 7 *Ves.* 305 ; *Smith* v. *Collyer*, 8 *Id.* 89 ; *Colburn* v. *Richards*, 13 *Mass. Rep.* 420 ; *Livingston* v. *Livingston*, 4 *John. Ch. Rep.* 294 ; *Dale* v. *Roosevelt*, 6 *Id.* 257 ; *Smith* v. *Carl*, 5 *Id.* 118 ; *Niven* v. *Belknap*, 2 *John. Rep.* 573.

THE CHANCELLOR.    If the circuit judge was correct in the conclusion at which he arrived as to the rights of these parties, there can be no reasonable doubt that this was a proper case for the interference of a court of equity to protect those rights. The complainants and those under whom they claimed were, and for a long time had been the owners of several very valuable mills, which depended upon the waters of the Great Pond for support a considerable portion of the year.    They had also for a long period of time enjoyed the use of the water in a particular manner ; and upon which use the principal value of their mill property depended.    Under such circumstances the defendant attempted to control the use of the wa-

ter in such a manner as to prevent the running of the mills; which attempt, if persisted in, would in time destroy the whole of this valuable property. To establish their rights at law, each of these several mill owners would be compelled to bring a separate suit against the defendant; leaving their mills to stand still in the mean time. And even this multiplicity of suits would afford them no adequate remedy for their continually accruing damages during the suspension of their rights. This is a sufficient answer to the objection that was made in the court below, and which is again repeated here, that the complainants' bill should have been dismissed, with costs, because they had not established their right at law previous to the commencement of this suit.

It is said, however, that the judge, in the court below, should not have decided the question of right himself, but should have awarded a feigned issue for that purpose. As the right of the complainants was denied by the answer of the defendant, I am inclined to think that if the defendant on the hearing of the cause in the court below had asked for an issue, or a trial at law, to settle the question of right between the parties previous to the making of a final decree, that such request should have been granted. It appears, however, by a reference to the points made upon that hearing, that the defendant did not then ask for an issue; and the question is raised for the first time here. In a recent case which was before me on appeal from the late equity court of the eighth circuit,[a] I came to the conclusion that if a party did not think proper to ask for an issue in the court below, in a case in which there was no positive rule of law requiring such issue, that he could not, upon appeal, claim to have the decree reversed merely on the ground that it was a proper case for an issue.

It seems to be unnecessary in this case to trace the several titles to the outlet farm, in connection with the ownership of the mills below. Previous to 1790 George Clinton appears to have been the owner of mills upon the Quassaick creek; and he probably purchased the outlet farm for the purpose of

(a) *Townsend* v. *Graves, ante, p.* 453.

procuring water for those mills. In 1790 he conveyed a part of his mills below to H. Walsh, and probably he parted with the residue before he conveyed the outlet farm to Walsh and Byrne in October, 1793. By the several conveyances which were executed in May, 1797, between Byrne, Walsh, Niven and Van Duzer, the legal title to the outlet farm, except the outlet itself and twenty-five feet on each side thereof, was vested in Byrne and Van Duzer; and afterwards passed to H. Walsh, under the foreclosure of the mortgage to Clinton. The legal title to the outlet and the twenty-five feet on each side thereof, subsequent to the 23d of May, 1797, was in Walsh, Byrne, Niven and Van Duzer, in equal shares. And it was to remain in common among their heirs and assigns for ever, for the purpose of drawing off the waters of the pond as might be found necessary for the common interest; and was not to be appropriated to any other use. The one fourth of this reserved property passed to Joshua Byrne, by the will of his father, and is now vested in the complainants Trimble and Dubois, under the deed of October, 1824. Van Duzer's share has been conveyed to the complainants J. & C. Halstead, since the commencement of this suit. And Niven's share probably remains in him, if he is still alive; and if he is not, it must have descended to his heirs, as there is no evidence that he ever has conveyed it. The other fourth of this reservation remained in H. Walsh at the time of his conveyance to Gilbert Jones, in April, 1802. And the legal title therein passed to Jones, under that conveyance; subject to the proviso to that deed, executed by Jones at the same time, and thus made a part thereof. The right thus acquired by Jones, being the whole of the outlet farm, with the exception of three fourths of the outlet and twenty-five feet on each side thereof, subject to the reserved rights of the former owners and their assigns, passed to the three Belknaps under the administrator's deed in April, 1809; and the whole, or a part thereof, is now vested in the appellant under the title thus acquired. The proviso annexed to the deed to Jones and endorsed thereon, which as it was executed at the same time must be considered as a part of that deed, is as follows: "Provided always, and it is the true intent and meaning of the above nam-

ed Hugh Walsh and Gilbert Jones, that it shall be lawful to and for Daniel Niven and Hugh Walsh, their and each of their heirs and assigns at all times to dig, widen and deepen the present water course into the pond as far as needful, and from the said pond or lake in this indenture mentioned to the floor of the floom of the grist mill and saw mill of the said Gilbert·Jones so deep as to be on a water level from said floor to the said·pond ; and also to have the liberty and privilege in a scarce time of water to hoist the gates at the said pond, and let the water run at any time after it shall have been shut up for more than twelve hours to the damage of the said Hugh Walsh and Daniel Niven, or either of them, their, or either of their heirs and assigns ; and to keep the same open after every such shutting in a scarce time, also twelve hours for the accommodation of the mills of the said Daniel Niven and Hugh Walsh. In witness," &c.

From this examination of the legal titles it is evident that the persons in whom the legal title to the outlet was vested, from time to time, previous to the conveyance from Walsh to Gilbert Jones in 1802, and who were also owners of mills on the stream below, had reserved the common use of the water of the Great Pond to be kept and let out, from time to time, as it might be wanted in seasons of drought, for the benefit of their mills below. And although Hugh Walsh, and those claiming under him by subsequent conveyances, might be bound by the new arrangement as to the use of the water, made between him and Jones in 1802, that arrangement could not bind others who had acquired rights under the arrangement of 1797. Putting the question in this case therefore upon the strict legal title, as it is established by the different conveyances, most of these complainants are entitled to the common use of the waters, for the benefit of their mills below, to be let out from the dam at such times and in such quantities as may be most conducive to the interests of all. Under such circumstances it would be the duty of a court of equity so to regulate the common use of the water as to preserve the rights of each. In the present situation of the several milling establishments on this stream I do not understand that there

could be any difficulty, whatever ; as what would be beneficial to one mill owner would necessarily be beneficial to all the rest.

I think, however, this case was properly put by the court below upon another principle, and which is applicable to all the complainants, as mill owners on this stream below the pond farm. The conveyance from Walsh to G. Jones, which professed to regulate the use of the water in a particular man- ner, was given twenty-two years before the appellant acquired any title to the outlet farm ; and there does not appear to have been any use of the water during that period corresponding with the arrangement then entered into between Jones and Walsh. On the contrary the evidence establishes the fact, that, both before and after the conveyance to Jones, all the mill owners below, who had an interest in damming up these wa- ters and preserving them for a time of drought and then let- ting them out as they were wanted for the use of their mills, had enjoyed that right uninterruptedly ; and substantially in the same manner as is provided for in the decree of the equity court. It was supposed by the counsel for the appellant that the testimony of D. Belknap and the Gardiners was. wholly inconsistent with the complainants' right to use the water as contemplated in the decree. But as I understand that testi- mony it is calculated to strengthen the presumption in favor of that right, and to show an exercise of a right of using these waters in a different manner from the natural discharge there- of from the Great Pond. The right claimed by the complain- ants is to keep the waters of the pond dammed up to a certain height until the stream below becomes too low to propel their machinery, and then to let them out as they are wanted. The Great Pond is not the only source from which water is sup- plied for the mills below. But the mills to which the testimo- ny of these witnesses related were situated above the other streams which fall into the Quassaick creek, and which supply the complainants' mills a certain portion of the year. The mills above, which derived their supply from the waters of the pond alone, would of course be deprived of water, by reason of the dam, while the mills below were supplied from these other sources. It was therefore for the interest of the mill owners below to keep the waters of the pond shut up until after the

1832.

Belknap
v.
Trimble.

other sources had failed. And it appears from the testimony of these three witnesses that the owners of the mills below, who had the control of the outlet, exercised the power of keeping the waters thus dammed up, in defiance of the claims of the two mill owners who would have been more benefitted by the natural flow of the stream. The fact that the owners of those two mills which have now ceased to exist, asked as a favor that the water might be permitted to flow to their mills while the owners below were preserving it for a season of greater drought, is not therefore inconsistent with the right claimed by these complainants.

The learned commentator on American law lays it down as the established doctrine, both here and in England, that the exclusive enjoyment of water in a particular way for twenty years, without interruption, becomes an adverse enjoyment sufficient to raise a presumption of title, as against a right in any other person which might have been, but was not asserted. Neither is it necessary that the person claiming this prescriptive right to the use of water should have used it in the same precise manner during the twenty years; or that it should have been used to propel the same machinery. All that the law requires is that the mode or manner of using the water should not have been materially varied to the prejudice of others. (See 3 *Kent's Comm.* 2d ed. 442.) I apprehend also that this rule must be reciprocal; and that a proprietor at the head of a stream who has changed the natural flow of the waters, and has continued such change for more than twenty years, cannot afterwards be permitted to restore it to its natural state, when it will have the effect to destroy the mills of other proprietors below, which have been erected in reference to such change in the natural flow of the stream.

The appellant had no claim to be excused from the payment of costs. He was not the owner of any mill in which the right to use the water came in conflict with the rights of the complainants as settled by the decree. I cannot believe he had any intention of re-occupying the mill scite on the outlet farm. He probably supposed himself in the possession of a legal right to destroy the complainants' mills, by interrupt-

1832.

Mechanics'
Bank
v.
Levy.

ing the use of the water ; and he hoped to be able to avail himself of it in such a manner as to make money out of their necessities.   He interrupted them in the enjoyment of their rights when it could not benefit him in any other way than by compelling them to buy their peace.   Under such circumstances, if a party mistakes his legal rights, he has no particular claim to the favor of the court.  The decree of the equity court is therefore affirmed, with costs.

---

### MECHANICS' BANK *vs.* LEVY & WOLFE.

The complainant may call for an answer on oath not only to the main charges in the bill, upon which his claim to relief is founded, but also as to matters of evidence and collateral facts, stated in the bill, which are material in establishing the main charges, or in ascertaining the nature or kind of relief to which he is entitled.

The defendant is not bound to answer an interrogatory unless the same is founded upon some allegation or charge in the bill.   It is sufficient, however, if the interrogatory is founded upon a statement in the bill which is inserted therein merely as evidence in support of the main charges.

Where a person obtains money from a bank, by an improper and fraudulent *overdrawing* of his account, and the money thus obtained is placed in the hands of a third person, who has notice of the fraud before he parts with the money, or pays any valuable consideration therefor, the latter cannot retain the money against the just claim of the bank.

Where a fact is stated in the bill by way of recital merely, without any interrogatory calling for an answer as to that fact, the defendant is not bound either to admit or deny the same.

If the defendant admits the main fact charged in the bill, it is unnecessary for him to answer as to other matters which are merely stated as evidence of that fact.

October 22.      THIS cause came before the chancellor on appeal by the defendants from the decision of the vice chancellor of the first *circuit*, overruling their exceptions to the master's report on exceptions to their several answers.   The bill was filed by judgment creditors of the defendant Levy, after the return of their execution at law against him unsatisfied.   The bill alleged, among other things, that the defendant Levy obtained monies from the complainants' bank fraudulently, and by collusion between him and the defendant Wolfe, who was his

son-in-law, by overdrawing his account; and charged that Wolfe received the money thus obtained from the bank, and still had the same, or a very large amount thereof, in his possession. The bill also charged that after Levy had so overdrawn his account with the complainants he petitioned for the benefit of the insolvent law. That the granting of his discharge was opposed; and upon that occasion both of the defendants in this suit were sworn and examined. That from such examination it appeared Levy had knowingly and fraudulently overdrawn his account with the complainants, for the purpose of placing the monies thus obtained in the hands of Wolfe; that the monies were placed in his hands accordingly, and he knew at the time that they had been obtained by such overdrawing; and that those monies, or the greater part thereof, were in the hands of Wolfe at the time of such examination. The exceptions which were sustained by the vice chancellor, related principally to the neglect of the defendants to answer interrogatories founded upon the specific allegations in the bill as to what appeared from the examination of the defendants on that occasion.

*H. W. Warner*, for the complainants.

*J. L. Wendell*, for the defendants.

THE CHANCELLOR. Before going into the examination of the several exceptions particularly, it may be proper to notice a general objection, by the defendants' counsel, which is supposed by him to apply to the whole. It is said there are no charges in the bill to sustain the interrogatories upon which the exceptions are based; and therefore that the defendants were not bound to answer the matters enquired of by such interrogatories. The counsel is undoubtedly correct in the principle that a defendant cannot be called upon to answer any interrogatory which is not founded upon some allegation or charge in the bill. (*Mitford*, 4th Lond. ed. 45. 1 *Newl. Prac.* 3d Lond. ed. 255.) But it is not necessary that the interrogatory should arise directly out of one of those material averments in the bill upon which the complainants' right to relief essentially depends.

It is sufficient, to entitle him to an answer to the interrogatory, if it is founded upon a statement in the bill which is set up merely as evidence in support of the main charges therein. In framing an ordinary bill in chancery the pleader has a two fold object, discovery and relief. The allegations in the bill, so far as the question of the complainants' right to relief is concerned, are substantially in the same form as the averments in a declaration at law. And the pleader must state his client's cause of action in such a manner that the main facts upon which his right to relief depends may be put in issue and tried. But the complainant, in addition to this, has a right to examine the defendant, on oath, in support of the main charges upon which his claim to the interposition of the court in his favor is based, and also as to any collateral facts which may be material in determining the extent, or kind of relief to which he is entitled, if the main charges in the bill are admitted or proved. He may, therefore, state any matters of evidence in his bill which may be material in establishing the main charge, or in ascertaining the nature or kind of relief proper to be administered ; and may interrogate the defendant as to those matters. In this case some of the main facts, upon which the complainants seek relief against the defendant Wolfe, are, that the money was fraudulently obtained from the bank, and was placed in his hands without consideration, where it remained at the time of the examination before the recorder, when the circumstances of the fraud appeared upon the examination of these defendants on oath. And there can be no doubt, in this case, that if the fact is established that the money was improperly and fraudulently obtained from the complainants' clerks, and that Wolfe had notice of that fact before he parted with the money or paid a valuable consideration therefor, he cannot in equity be permitted to retain the same as against the just claims of the complainants thereon. (*Trademan's Bank* v. *Merritt*, 1 *Paige's Rep.* 302.) The allegations in the bill as to what took place before the recorder are therefore material, not only to show that Wolfe then had notice of the fraud, while the money was still in his hands, but also as evidence in support of the main charge of fraud and collusion, upon which the complainants' claim as against Wolfe mainly rests.

The fourth exception to the answer of Levy, which is the first allowed by the vice chancellor, relates to the amount due the complainants on their judgment. In a case of this kind the 189th rule requires the complainant to state the true sum due on his judgment, over and above all just claims of the defendant by way of set off or otherwise. This allegation in the bill was therefore material; and the defendant probably intended to admit the whole amount of the judgment and the interest thereon to be due, as stated in the bill. But by a slip in the phraseology of the answer the proper admission is not made. I must therefore, though with some hesitation, affirm the decision of the master and the vice chancellor as to this exception.

The fifth exception is for not answering an interrogatory which calls upon Levy to disclose whether the overdrawing at the bank was not voluntary and premeditated. The charges in the bill are that the monies were obtained by overdrawing, and by fraud and collusion between him and Wolfe, his son-in-law; and that it appeared on the examination before the recorder that the overdrawing was voluntary and premeditated. The discovery called for by this exception is material in the establishment of a fraud in obtaining the money from the bank. A wilful and intentional overdrawing, by a person who knew he had not the means of making good his account, might be a gross fraud, considering the manner in which business is done in the banks of our large commercial cities; especially if it should appear that several checks were drawn at the same time and presented separately, or by different individuals, so as to elude the vigilance of the officers of the institution, by giving to such checks the appearance of ordinary business drafts. Whereas if the drawer overdrew by mistake, or under the supposition that he would have funds there to meet the drafts at the time they were presented, or before the bank closed, the transaction would be perfectly fair and honest, if no means were resorted to for the purpose of preventing the officers of the bank from noticing the fact that he had not funds in the bank at the time. This exception was therefore properly allowed.

The sixth exception is founded upon an interrogatory, in the bill, calling upon Levy to disclose whether he delivered the checks, on which the money was obtained, to Wolfe, or to any other person for his use ; and to whom in particular. He says he delivered two of the checks to the clerk of Wolfe, but does not disclose who that clerk was. It may be material to ascertain who that clerk was, not only for the purpose of show-ing that the complainants' money went directly into the hands of Wolfe, but also to ascertain how much went there. Even if the separate answer of Wolfe could be referred to as an ad-mission that the money came to his hands, it does not remove the difficulty ; as he only admits the receipt of two thousand dollars, and there are no two of the checks corresponding in a-mount with such admission. The discovery of the particular in-dividual to whom the checks were given may also be very ma-terial on other grounds, which it is not necessary here to state. The complainants having distinctly called for a discovery as to the person to whom the checks were given, there is no good reason assigned for withholding his name.

The eighth exception is founded upon an interrogatory call-ing upon Levy to state whether Wolfe is not now indebted to him ; and if so, in what amount. I have not been able to find any allegation in the bill on which to sustain this inter-rogatory, to the extent claimed by this exception. Except from the allegation that it appeared on the examination be-fore the recorder that Wolfe was then indebted to Levy, there is nothing on which to found a presumption that he was in-debted to him at the time of filing the complainants' bill, or at any time since. And a defect in the charging part of the bill cannot be supplied by a subsequent interrogatory ; which is to be construed by the charging part, and is not to be con-sidered more extensive. The fact of the indebtedness at the time of the examination before the recorder, is admitted by the answer of Levy. But he further states, that subsequent-ly, and before the filing of this bill, he compounded with Wolfe at the rate of twenty five cents on a dollar, and received the amount thus agreed upon, in full satisfaction and discharge of his debt. As there is no suggestion of any subsequent indebt-edness by Wolfe to him, I must consider this a perfect an-

swer to every thing that could properly be inquired of, or which he was bound to answer under this interrogatory. This exception cannot therefore be sustained.

The tenth exception is evidently well taken ; as the defendant Levy admits, by implication at least, that he has still in his possession a part of the monies received from Wolfe on the compromise with him. The complainants are entitled to a discovery of the nature and amount of all the property and effects of their judgment debtor, as well to sustain and prove the allegation in the bill that he had property to the value of $100 or more, so as to give this court jurisdiction to make a decree in their favor, as to have such property applied to the satisfaction of their debt.

The eleventh exception is not well taken. As there is no allegation or suggestion in the complainants' bill that the purchasers of the notes, or the other Carolina property, did not purchase that property fairly and bona fide, it would not benefit the complainants if Levy should admit that he sold the notes, and his interest in the other property, for less than half their value. Although the court might be satisfied that he parted with the property in that manner for the purpose of defrauding his creditors, yet, if the vendees purchased it in good faith, their title cannot be disturbed. And the establishment of the fraud against Levy would not make him liable to the complainants beyond the amount of their debt, for which he is liable in any event. If there had been any allegation in the bill, suggesting a fraudulent agreement between him and Wolfe to overdraw the bank, and then to sell off his property and to put the proceeds in the hands of the latter to keep it out of the reach of legal process, it might have presented a different question.

The permission to the complainants to amend their bill was a matter of course, under the 45th and 190th rules, upon the allowance of any of the exceptions for insufficiency. A majority of the exceptions to the answer of Levy not having been finally allowed, the complainants are only entitled to the costs of the original exceptions which were allowed. And neither party is to have any costs upon the reference, or upon the hear-

ing before the vice chancellor, or upon this appeal. The or-
der of the vice chancellor is to be modified accordingly.

The second exception to the answer of Wolfe is founded up-
on the neglect of this defendant to state in his answer wheth-
er he was the son-in-law of his co-defendant Levy. The fact
of relationship is not material to the relief sought by this bill
against either of the defendants. But I agree with the vice
chancellor that, in connection with the facts charged, it might
not be unimportant as a circumstance to sustain the charge of
fraud. The difficulty, however, in sustaining this exception is,
that the relationship is stated in the bill by way of recital mere-
ly, and not as a positive allegation. And there is no interroga-
tory calling upon the defendant to answer as to his relation-
ship to Levy. Although a mere recital of a fact may perhaps
be sufficient to justify an interrogatory calling upon the de-
fendant to answer as to that fact, so that it may be used as
evidence, yet I do not think he was called upon in this case
without such an interrogatory, to admit or deny the fact re-
cited. This exception should therefore have been disallowed.
(*See Albretcht* v. *Sussmann,* 2 *Ves. & Bea.* 323.)

The matters of the third and fourth exceptions, to the an-
swer of this defendant, appear to be very material to the es-
tablishment of the complainants' claims against him, for the
monies alleged to have been obtained from their bank by fraud
and collusion. The defendant is particularly interrogated as
to the matters of these exceptions; and the particular sums
of money received by him from Levy, and the precise time at
which each particular sum was received by him, appear to be
material when taken in connection with other facts in the
case. He must also answer, not only as to his knowledge of
the fact of the money having been overdrawn from the bank,
but as to his understanding, belief and reasons for supposing
that the money had been thus obtained, and as to the time
when that information was first received by him. These two
exceptions were therefore properly allowed.

The fifth exception calls upon this defendant to answer
whether he admitted, when under oath before the recorder,
that he had received the sum of $4300 of Levy, with a knowl-
edge that the same had been overdrawn from the complainants'

bank. By the preceding exception, the defendant was called upon to answer as to the fact of his knowledge of the overdrawing at the time he received the money from Levy. If, in answering that exception, he admits he had such knowledge, it cannot be material for the complainants to show that he made a similar admission on his examination before the recorder. On the contrary, if he denies that he had such knowledge, the complainants cannot compel him to answer whether he swore differently on the occasion alluded to ; as that might subject him to a prosecution for perjury. The complainants must therefore confine themselves to the answer to the main fact ; and this exception must be overruled, as one which the defendant may not answer with safety to himself. As the money was still in his hands at the time of his examination before the recorder, if he was then informed that it had been obtained from the bank, by Levy, illegally and improperly, it is perhaps not very material to inquire whether he had any previous knowledge of the fact ; as he could not afterwards pay it over to Levy, so as to deprive the complainants of their rights as against himself.

The sixth exception calls upon Wolfe to disclose what disposition was made of the money received by him from Levy, and what has become of that part of it which remained in his hands at the time of his examination before the recorder. This exception is evidently well taken ; as the complainants are entitled to follow their money, so long as it can be traced and identified, into the hands of any person who has not actually received it for a valuable consideration without notice of their rights.

The order of the vice chancellor, which is appealed from by this defendant, must therefore be modified so as to conform to this decision. And as a majority of the exceptions to this answer are not allowed, the complainants are not entitled to the costs of the reference. And neither party is to have costs as against the other upon the exceptions taken to the master's report, or upon the hearing before the vice chancellor, or upon this appeal.

1832.

Mechanics'
Bank
v.
Levy.

NEIMCEWICZ *vs.* H. GAHN and others.

J. GAHN *vs.* NEIMCEWICZ and H. GAHN.

·Where a wife unites with her husband in a mortgage of her real estate merely
   as a security for the payment of his debt, she is entitled to have his interest
   in the estate, as tenant by the curtesy, first sold and applied to the pay-
   ment of the debt, in exoneration of her estate or interest in the mortgaged
   premises.

This equity is paramount to the claim of a judgment creditor who has only
   a general lien upon the husband's interest in the premises subsequent to
   the mortgage.

If the fact, that the wife executed the mortgage as the surety of her husband
   merely, does not appear upon the face of the instrument, it may be estab-
   lished by parol proof.

· Where a wife becomes a surety for her husband, by the creation of a valid
   lien upon her own property or estate, she is entitled to the same equitable
   rights as other sureties.

Where the creditor, without the consent of the surety, makes a binding
   agreement with the principal debtor to extend the time of payment of the
   debt, the surety is discharged ; and this rule extends to those cases where
   the surety only pledges his property for the debt of the principal, as well as
   to those in which the surety becomes personally bound.

Where a surety is compelled to pay the debt of his principal, in order to save
   his property or to discharge his personal liability, he has an equitable right
   to be substituted in the place of the creditor as to all his remedies against
   the principal debtor and his estate.

Whether a mere extension of time, which does not injure the surety, will dis-
   charge him, or his estate, in cases where the rights and duties of the parties
   are not regulated by contract between them ? Quære.

If a creditor without the consent of the surety relinquishes a subsidiary secu-
   rity which he holds against the principal debtor or his estate, he dischages
   the liability of the surety pro tanto.

But if the fact of suretyship does not appear upon the face of the contract, the
   liability of a surety will not be discharged, either by extending indulgence
   to the principal debtor, or by the relinquishment of other securities, if the
   creditor at the time of the act complained of did not know that he stood
   in the situation of a surety.

October 22.    THIS was an appeal from a decree of the vice chancellor of
the fourth circuit.    The original bill was filed to foreclose a
mortgage from H. Gahn and Jane his wife to Mrs. Neimce-
wicz, to secure the payment of $7000 and interest ; and the
mortgagors, together with certain judgment creditors of H.
Gahn, were made defendants.    Mrs. Gahn put in a separate
answer stating, among other things, that the mortgaged prem-

ises belonged to her by descent from her mother, and that she joined with her husband in the mortgage to secure a debt due from him to the complainant, and which was secured by his separate bond. That she executed the mortgage as the surety of her husband, upon his solicitation, and under a belief that he would pay the interest punctually, and would gradually reduce the amount of the principal of the debt; and that until about the time of the filing of this bill, she supposed the interest on the mortgage had been punctually paid. She further alleged, in her answer, that since the execution of the mortgage, H. Gahn had acted as the agent of Mrs. Neimcewicz in New-York, and had received for and paid over to her from time to time large sums of money, and that she had extended the time of payment of the mortgage; in the course of which dealings, the balance due from G. Gahn, as well on account of the bond and mortgage as otherwise, had varied. That on the first of April, 1825, she took from the defendant, H. Gahn, a promissory note for $8388, payable 30 days after the date thereof, with interest, for the balance then due from him exclusive of the principal of the mortgage, and that it included all the arrears of interest due on the mortgage up to the first of February, 1825. That these transactions between her husband and Mrs. Neimcewicz had taken place without the knowledge or consent of Mrs. Gahn; and that the complainant might and could with proper diligence have collected all the interest, and a part if not the whole of the principal of the mortgage from H. Gahn. She therefore insisted that the mortgagee had forfeited her claim upon the estate of this defendant, and discharged the lien she would otherwise have had thereon, both for principal and interest.

The defendant, Mrs. Gahn, also filed a cross bill against her husband, and against the complainant in the original cause, setting forth in substance the same matters contained in her answer to the original bill. In the cross bill Mrs. Gahn also alleged that $2000 of the monies included in the mortgage were for monies loaned to her husband by Mrs. Neimcewicz before his marriage; that numerous payments had been made by H. Gahn, and received by the mortgagee on account of

the bond and mortgage ; that other payments were tendered to her by him which she declined to receive, wishing to keep the money out at interest ; and that in April, 1825, it was devised and agreed between H. Gahn, the husband, and Mrs. Neimcewicz that the payments which had been made on the bond and mortgage should be credited on other claims against him, for which she had no security, leaving the whole amount of the mortgage apparently due and unpaid.

To the cross bill Mrs. Neimcewicz put in an answer, stating that she believed, and therefore admitted, that the real estate in the cross bill mentioned, including the mortgaged premises, belonged to Mrs. Gahn at the time of her marriage. She denied that H. Gahn was indebted to her in the sum of $2000 at the time of his marriage ; but she admitted that he might have had in his hands at that time, as her agent, a small sum, not exceeding two or three hundred dollars. She also stated, that shortly after their marriage, H. Gahn and his wife came to visit her at her residence in New-Jersey, and while there, H. Gahn negotiated a loan of $2500, for which he and his wife executed a bond and mortgage upon the wife's estate. That when H. Gahn applied for the loan, he represented that his wife's property was unproductive, but was advancing in value ; for which reason they were unwilling to sell. And that by the aid of the loan, and from what he should be able to make himself, he could provide for his family without sacrificing his wife's estate. That previous to the 22d of July, 1818, H. Gahn had in his hands monies received by him as her agent, and temporarily retained by him with her tacit assent, which monies, together with the interest due on the $2500 loan, amounted to $720,75. That he then applied to her for a further loan of $4500, including the last mentioned sum, which loan was made to him, and for which, together with the amount of the first loan of $2500, the bond and mortgage now in controversy were given. That H. Gahn continued to pay the interest on the bond and mortgage until the first of November, 1820, when he ceased to pay interest, and also neglected to pay over the monies received by him as her agent ; representing from time to time that he would shortly be able to pay the sums so retained by him, and

the whole or a considerable part of the mortgage monies. That she believed all the monies so received and retained by him went to support his wife and family ; and that she would not have permitted him to retain the said monies, had she not supposed she was conferring an essential benefit on the wife as well as her husband, by preventing, by those occasional supplies, the necessity of selling the real estate of Mrs. Gahn at a disadvantage. She denied that she ever received any payment whatever on account of the principal sum due on the bond and mortgage, or any payment on account of interest thereon subsequent to November, 1820, or any sum of money which was intended to be, or could have been applied on the bond and mortgage ; or that H. Gahn had ever offered to pay any part of the mortgage. And she alleged that the whole amount of principal, with the interest thereon from the first of November, 1820, was still justly due. That there was also due to her several sums for monies retained by H. Gahn as her agent, which, with the interest on the mortgage up to the first of February, 1821, amounted to $8388, and for which amount H. Gahn gave to her, by way of memorandum, the note in the cross bill mentioned. That it was not her intention in accepting, or the intention of H. Gahn in giving such note, to relinquish or discharge the security of the bond and mortgage, for the arrears of interest included therein. She also stated that she did not know whether the monies secured by the bond and mortgage were actually received by Mrs. Gahn, or applied directly to the benefit of her property ; but that she believed they were applied to the support of her establishment, and thus relieved her real estate, and prevented the same from being sold prematurely. To the answers replications were filed, and some testimony was taken ; but the testimony did not materially alter the case as stated in the answer of Mrs. Neimcewicz to the cross bill.

The vice chancellor decided and declared, that, as the debt for which the mortgage was given was the proper debt of the husband, the wife must in equity be deemed to have executed the mortgage as the surety of her husband ; and that she was therefore entitled, in respect to her interest in the mort-

gaged premises, to all the rights and privileges of a personal surety. That by the taking of the note of the first of April, 1825, the estate of the wife was exonerated from the lien of the mortgage to the extent of the arrears of interest included in that note; but that both hers and her husband's estates in the mortgaged premises remained chargeable, with the residue of the principal and interest due on the bond and mortgage; and that the husband's interest in the premises remained also liable for the payment of the arrears of interest included in the note. That the mortgagee was entitled to a decree for the sale of so much of the estates of both the husband and wife in the premises, as would be necessary to discharge the principal and interest not included in the note; and that the husband's interest in the residue of the estate, or in the surplus monies, if the whole was sold, should be appropriated to pay the amount of interest included in the note, &c. And a reference to a master was thereupon directed, to take and state two separate accounts of the amount due upon these principles, reserving all further questions and directions.

The complainant in the original bill appealed from that part of the decree which declared that Mrs. Gahn was to be deemed, in equity, to have executed the mortgage as a surety for her husband, and that she was entitled to the rights and privileges of a surety; and from so much thereof as adjudged that her interest in the mortgaged premises was discharged to the extent of the arrears of interest included in the note; and also from so much of the decree as directed the order and manner in which the estate of the husband and wife should be sold, and the disposition of the proceeds of such sale. The following is the opinion of the vice chancellor:

Cowen, V. C. The mortgage was for a loan to Henry Gahn, the husband, of $7000; and the premises charged are the wife's estate. The mortgage is in fee, and the estate is in fee in the wife. The principal sum is admitted to be due, and so of the interest *qua* the husband. But the wife insists that her land, (inheritance,) was a surety for her husband, and that on the 1st April, 1825, the complainant took Gahn's

negotiable note at thirty days for all the arrears of interest up to 1st February, 1825, thus giving time to the principal, and discharging the surety pro tanto ; *ergo,* the estate is liable only for the principal, and the interest accruing after the 1st of February, 1825.

I do not see that the complainant has received any monies from Gahn which she was bound to apply in extinguishment of the mortgage debt, nor will mere delay to sue or foreclose discharge the surety, there being no fraud pretended. (9 *Wheaton,* 736, 7.) The question then is confined to the interest which accrued before the 1st of February, 1825. For this interest the wife was a surety. True, her person was not bound ; but her property was—a most substantial suretyship. It is like the case of *Robinson* v. *Gee,* (1 *Ves. sen.* 251.) There the first tenant in tail borrowed money, and procured the tenant in tail in remainder to join with him in a mortgage to secure the money. The latter was holden a surety, and on the death of the principal was exonerated by his personal estate. Lord Hardwicke says, the remainder man might have got the place of the mortgagee in the principal's life time, and thus have reimbursed himself. So here, the husband could not get the money on a mortgage of his estate, *jure mariti,* and he therefore procured his wife to join, and mortgage her inheritance, which was, to all intents, her separate estate. Lord Hardwicke puts this case as a very common one, and says, that after the husband's death the wife shall be exonerated by his assets real or personal. She answers to the remainder man, in *Robinson* v. *Gee ;* her husband having the particular estate. "She is," says Lord Hardwicke, in *Patericke* v. *Powlet,* (2 *Atk.* 383, 4.) a case precisely like this, "entitled to stand in the place of the mortgagee." That case has generally been followed. Clancy says, in his treatise on the rights of married women, (p. 589,) "Where the wife advances or charges her separate property for her husband's use, intending it as a loan and not as a gift, she will be considered as the creditor, and will be supplied with all the means of enforcing the demand against her husband's estate, which the creditor possessed. Such is the doctrine, which seems to be

1832.

Neimcewicz
v.
Gahn.

without exception or qualification." In other words, she is a surety, and entitled to all a surety's rights and remedies.

Now it is conceded that if she were not Gahn's wife, if she were a stranger, she would be discharged by the note, as to the interest. We have the decision of Lord Hardwicke that she is a stranger; and, for the purposes of this suit, not the wife of Gahn. His words are, " She must be considered as a distinct person, and is equally entitled to stand in the place of the mortgagee as a stranger." (2 *Atk*. 384.) He was speaking, it is true, of an advance of money by the wife to raise an incumbrance against the estate of the husband; but the principle is the same, and he immediately puts the case of a mortgage by her, as parallel with the one under consideration. She need not wait till the husband's death; she is a present surety. The husband was not dead in the case of which he was speaking.

So in *Aguilar* v. *Aguilar*, (5 *Mad. Rep.* 414,) the wife charged her separate estate as security for an annuity granted by her husband; then he took the benefit of the insolvent debtor's act; and it was held, because she was surety, that even as against other subsequent annuitant creditors of the husband, his estate should be first applied to discharge hers; that is to say: she was allowed the same preference as the grantee of the first annuity: she came into his shoes because she was surety; and even during her husband's life. This was held by Sir John Leach, V. Ch. after two arguments. We see, then, that Mrs. Gahn is a surety; and I see no reason for distinguishing her case from that of a stranger in any respect.

The mortgagee took Gahn's negotiable note at thirty days for all the interest due February 1, 1825. This gave time for so much; it suspended the claim pro tanto for the term of the note, and so far varied the rights of the creditor. This effect of taking the note is not denied, but admitted. Then comes the well settled rule, that if a creditor, without the consent of the surety, give time to the principal debtor, by so doing he discharges the surety, (*Samuell* v. *Howarth*, 3 *Meriv*. 278.) The reason given is that the creditor has put it out of the power of the surety to consider whether he will have recourse

to his remedy against the principal or not ; and because he, in fact, cannot have the same remedy against the principal as he would have had under the original contract. (*Id.*) The case of *Rees* v. *Berrington*, (2 *Ves. jun.* 540,) is also full to every point in this case, after the relation between the husband and wife as principal and surety is once established. The reasoning at page 54 of that case gives the true ground of interference by a court of equity. That court never looks beyond the fact of suspension ; it never speculates upon the consequences to the surety, either actual or probable. (*Boultbee* v. *Stubbs*, 18 *Ves.* 20. *Bowmaker* v. *Moore*, 3 *Price*, 214.) Had it not been for this strong mark of confidence on the part of the complainant, the taking of the note, it is easy to conceive that the wife or her friends might have demanded that the mortgage debt should be immediately closed. I must, therefore, decree that the wife's inheritance is discharged from the interest up to February 1, 1825. There must be a reference to take two accounts : 1st, the whole debt and interest including the note ; 2d, the debt and interest, exclusive of the interest included in the note.

Since the execution of the mortgage, several judgments have been obtained against Gahn, which operate to incumber his interest, *jure uxoris*. The judgment creditors are made parties, and one of the defendant's points is that in respect to the charge upon her land as surety, she shall be preferred to the judgment creditors ; in other words, that she may take the place of the complainant, and have the husband's interest *jure uxoris* applied to satisfy her as surety in the mortgage. This is right, provided it be attainable in this suit. She is entitled to what is called subrogation ; i. e. to come round and be herself the mortgagee in place of the complainant. And holding that place, she, of course, takes preference to the subsequent incumbrancers. This is a familiar and perfectly well settled chancery rule ; and *Aguilar* v. *Aguilar*, (5 *Mad. Rep.* 414,) is this case precisely, only substituting judgment creditor for annuitant. There, as I before stated, the wife joined the husband in binding her separate estate, as surety for the annuity granted by her husband. This included both her separate estate and her husband's interest *jure mariti*. Then he grant-

1832.

Neimcewicz
v.
Gahn.

ed subsequent annuities, charged on his estate *jure mariti*, but in which the wife did not join. He afterwards became insolvent ; and it was held, on full deliberation, that she was entitled to have the husband's income, in the hands of his assignees, first applied in discharge of the annuity for which she was surety, even as between her and the subsequent incumbrancers of the husband alone.

I am asked to go farther, and apply the avails of the husband's interest *jure uxoris* exclusively to the debt decreed against the surety. But all his interest is still bound ; so far as his incumbered funds are concerned, they are all saved; and the surety suffers no injury, nor possibility of injury. She comes into the complainant's place, taking all her rights as mortgagee. So far, there is no possibility of loss. Her loss was by a suspension of the mortgagee's personal remedy for the interest included in the note. Against this the wife is relieved. *Capel* v. *Butler*, (2 *Sim. & Stuart*, 457,) is relied on ; but there the benefit of some of the securities, two vessels, were absolutely lost to the surety by the negligence of the creditor in not getting a proper assignment. The consequence was, that the value of the vessels, as against the surety, was deducted from the redemption money of the annuity. What was done with the remaining securities does not appear in the report.

Suppose in this case, the wife had been discharged from the whole debt. The mortgage against the husband's interest would still remain for the whole. She being discharged for only a part, *a fortiori*, the mortgage against the husband remains for the whole, and, of course, for that part of the whole from which she was discharged. Had the creditor flung away the security against the husband's land, or any part of it, she would lose so much. But the creditor has done nothing of the kind. The whole security remains. The note does not discharge the principal ; it only relieves the surety from so much. In all other respects the mortgagee's rights remain. The wife is entitled to the mortgage as an indemnity, and nothing more.

But how am I to give the relief sought for in this case? The judgment creditors are not parties to this question ; the

complainant's bill shows no such ground. Mrs. Gahn sets up her right in her answer, and in her cross bill ; and she does not make the judgment creditors parties. They have had no chance to take issue on the rights thus set up ; and, for aught they knew, Mrs. Gahn joined in the mortgage merely to bar a contingent claim for dower. They might show or insist on this. She should have brought them in by her cross bill, apprising them of what she claims, and given them a chance for defence. Having omitted this, if she has any remedy, it must be by a future independent bill against the complainant, her husband, and the creditors, claiming what may be left of the husband's interest after the mortgage shall be satisfied, if any thing shall remain. To secure the rights of the wife, as between these parties, the complainant must go on and sell the interest of both husband and wife, till the debt against both shall be satisfied. Then she must confine her sales, for the interest in the note, to the husband's estate *jure mariti.*

Such are my present views ; but it is not necessary to dispose of that branch of the case respecting the judgment creditors till the master's report comes in. For the present, declare that Mrs. Gahn was a surety for her husband in the mortgage, and that her interest in the mortgaged premises is an estate in fee, subject only to her husband's right therein *jure mariti ;* that the complainant having taken the note mentioned in the cross bill, for interest on the mortgage debt, up to February 1, 1825, payable at 30 days, signed by Gahn, (the principal mortgagor,) thereby discharged the surety pro tanto ; that, except for this interest, the mortgaged premises remain chargeable as originally, and liable to be sold by the complainant ; and that for the residue, she must look to the husband's estate *jure mariti ;* or, if the whole shall be sold to satisfy the principal, she must take a personal decree against the husband for the residue.

Let there be a reference to a master to take and state, 1. an account of the mortgage debt, over and above and excluding the mortgage interest included in the note ; 2. an account of that interest ; and to report both sums to the court. And let all other questions be reserved till the coming in of

the report.   As yet no final disposition is made as to the rights of the judgment creditors; though I strongly incline to the opinion that they cannot be touched in the form in which the question comes before me.

*J. Duer & B. Robinson,* for complainant.   The argument on the part of Mrs. Gahn may be reduced to the following positions : 1.   That a wife mortgaging her separate estate for the benefit of her husband, is to be regarded in equity as a surety, and as against the mortgagee is entitled to all the rights and privileges of a surety; and 2.   That from the facts admitted or proved in this case, it appears that the complainant was guilty of such laches in the collection of the debt as would be sufficient to discharge a surety, and that the estate of the wife is consequently exonerated.   We deny both of these positions.

It is indeed established and familiar law, that a person individually bound for the debt of another may in many cases be discharged by the acts or laches of the creditor, although the debt as against the principal is still retained, but it is a discharge from a personal liability, to which these cases without an exception refer.   There is not a single case, not a solitary dictum to support the position that where a third person by a valid instrument pledges his property, real or personal, to secure the debt of another, the creditor can be deprived of the benefit of this security, by any circumstance which would not equally release the pledge, were it the property of the debtor himself.

The position we are controverting is repugnant to the very nature of a pledge ; which is always meant to accompany the debt it is meant to secure, so that their co-existence may be truly said to be one of the terms of the contract.   He who, without being personally bound, mortgages his lands for the benefit of another, by the very act consents that so far as the security is concerned, the lands shall be treated as those of the debtor himself, and that his own rights, as ultimate owner, shall be subordinate to those of the creditor.   As between him and the debtor the transaction may be a bounty, or in its consequences may create a debt; but as between him and the