## Townsend and others *vs.* McDonald.

Where several owners of adjacent land contribute jointly to the erection of a dam across a stream, and change the course of the stream, in part at least, by conducting it in a race-way across their lots, the law will secure to each the right to a just and reasonable participation in the use of the water.

That right, in the owner of each lot, is to raise the water by a bulkhead, or by machinery or otherwise, as high as the line of property on the stream; not as high as the line of property on the bank. Each owner may use the water as it passes over his lot, but not in a way, or to the extent, that will throw it back upon his neighbor above.

The rights of the parties are also liable to be changed, in the same way and under the same circumstances, as in regard to a natural stream. A continued use of the water, by flowing it back upon the lot above, or detracting from the value of its use below, for more than twenty years, will ripen into a legal right, and a grant will be presumed.

This rule of law is equally applicable, whether the rights were originally defined by agreement of the parties, or limited by operation of law. In either case, as the rights may be changed by grant, they will be held to be changed whenever a grant will be presumed.

In Equity. This suit was originally commenced by a bill filed before the vice chancellor of the third circuit. The object of the suit was to restrain the defendant from continuing and maintaining, and from erecting, any bulkhead, dam or other obstruction in or across the artificial channel through which was conducted the water used in driving and operating the flouring mill of the plaintiffs on the lot described in the bill, and from raising the banks of the pond, by which the water in said artificial channel should be penned up and set back upon the plaintiffs' lot, or water wheel; and from shutting down or closing the gate of the mill-race, or from obstructing or preventing the flow and discharge from the plaintiffs' lot, of the water used in propelling the water wheel attached to their flouring mill, in the manner in which the same had flowed and discharged prior to the 1st day of November, 1846. The defendant appeared and answered, and the plaintiffs filed a replication. An injunction was issued according to the prayer of the bill. On the 7th of September, 1847, the supreme court ordered the case to be referred to Deodatus Wright, Esq., to hear proofs and determine the matters in controversy. The referee, after hearing the

proofs and allegations of the parties made a report, by which he found the following facts: "In March, 1810, William Aikin, Titus Goodman and John Dickinson were the owners in fee as tenants in common of a certain piece of land, situate in Greenbush, Rensselaer county, to which they derived title from John Van Rensselaer. That for the purpose of making partition of a portion of said land between themselves, said Aikin, Goodman and Dickinson, the 13th day of January, 1812, caused a survey and map thereof to be made by Evert Van Allen, a surveyor. Aikin, Goodman and Dickinson, at that time divided and made partition of said lots between themselves in the manner and as marked and laid down upon said map. By said partition each became the owner in fee of the lots represented, and upon which his name is written on said map, numbers 1 and 5 falling to Aikin's share, 2 and 4 to Dickinson's, and 3 and 6 to Goodman's share. Said lots were surveyed and partitioned off for mill seats, and all were intended to be used for that purpose, and to be supplied with water from a pond, represented on said map and marked thereon " *Mill Pond*," which pond was created by a dam erected across a natural stream of water represented on said map; said dam was erected at a point represented on said map by the word " *Dam*." The natural channel of the creek or stream across which said dam was erected, and is now situated, is laid down and shown upon said map. The water was and is taken from said dam and carried by artificial works in nearly a direct line across the said lots Nos. 5, 4, 3, 2 and 1 in a westerly direction. Said lots are situated upon a side-hill; lot No. 5, which lies at the eastern extremity of said lots, being at its eastern line about eighty-six feet higher than lot No. 1, which is situated at the western extremity of said lots at its western boundary line. At the time Aikin, Goodman and Dickinson released and conveyed to each other so as to make each the owner in fee and in severalty of the lots represented on said map, on which his name is thereon written, they mutually covenanted and agreed with each other that each, his heirs and assigns, should bear and pay his just proportion of the costs and expenses which might from time to time be necessarily incurred for erecting, building, repairing

sustaining and supporting a good and sufficient dam across the creek or stream aforesaid, at the point represented by the word " *Dam,*" on said map, which said expense was to be borne and paid by each of said parties in the ratio and according to the relative value of the different kinds of machinery which should, or might be constructed, or erected on any of said mill lots; and they further covenanted and agreed to and with each other that neither of the parties, their heirs or assigns, should or would in any manner, waste or obstruct or divert the water of said creek which was not necessarily used or expended for putting and keeping in operation the mills and machinery erected or to be erected on any of said lots; and that neither party, his heirs or assigns, should or would so appropriate or use the water of said creek, to put and keep in operation any mills or other machinery, erected or to be erected on any of said lots designated on the aforesaid map, so as to deprive any other party, owning or occupying any of said lots, of a just and reasonable participation in the use of the water of said creek for mills or machinery that were or might be erected thereon. The object of said covenant and agreement for the erection and maintenance of said dam, was therein declared to be to raise a head or pond of water to supply such mill seats or other machinery as then was or might thereafter be erected or constructed on said mill seats. The deed from Goodman, to those under whom the plaintiffs claimed, contained mutual covenants as to the use of the water and repairing of the dam, similar to those contained in the agreement between Dickinson, Goodman and Aikin, and Goodman's conveyance was made subject to those reservations and restrictions. At the time said survey, map and partition were made, and for many years prior thereto, a flouring mill had been erected upon and was in operation on lot number 2, which has been twice rebuilt, and has been almost constantly ever since, and still is, in operation thereon. The water which now moves, and always has moved, the wheel which puts said mill in operation, is brought from the pond created by a dam erected and built across the creek or stream aforesaid. Said water is brought from said dam by artificial means across lots numbers 5, 4 and 3, to and

Townsend *v.* McDonald.

upon, said lot number 2, and is conducted and carried from lot number 2 in a race-way, which runs to lot number 1, and through and by said race-way, said water is discharged into and upon lot number 1. The plaintiffs, and those from whom they derived their title, have been seised in fee of said lot number 2, since the year 1817; and the plaintiffs were, at the time of the commencement of this suit, and now are, seised in fee of said lot, are now and were at the time of the commencement of this suit, in the actual possession and occupation of said lot, and they or those under whom they have derived their title have been in the actual possession and occupation thereof, for more than twenty-five years previous to the commencement of this suit; and were at that time, and for more than twenty-five previous thereto, excepting the intervals when the mill on said lot was out of repair, or was being rebuilt, had been during all that time engaged in manufacturing flour at the flouring mill on said lot. And the said plaintiffs, and those under whom they claim, have for more than twenty years previous to the time of the erection of said bulkhead, and other obstructions by the defendant, complained of in the bill of complaint in this cause, used and enjoyed the water flowing from the said dam, as aforesaid, for operating the said flouring mill, and those erected in place thereof on said lot, in such a manner, that the said water passed from their water wheel and was discharged on said lot No. 1, uninterruptedly and without being retarded or thrown back by any bulkhead or other obstruction, connected with any mill erected on said lot No. 1. On the 28th of January, 1824, the plaintiffs in this suit, after their purchase of lot No. 2, and before they erected a new mill on said lot, for the purpose of ascertaining the fall on said lot, procured a survey thereof to be made by surveyors Hooker and Van Allen; said surveyors made and signed a statement of their said survey, and indorsed it on the copy of the original map and survey made by Van Allen on the 13th January, 1814, which copy of said original map was produced and given in evidence on the trial of this cause. In one of the surveys made by Mr. Van Allen, he drove an iron bolt into the ground at the southeast corner of lot No. 2, and on the line between lot No. 2

and lot No. 1; the top of which bolt indicated the surface or level of the ground between said lots at that point. The plaintiffs' water wheel, as it stood at the commencement of this suit, was one $\frac{9\,2}{1\,0\,0}$ feet below the top of the iron bolt, and the fall on lot No. 2 measuring to the bottom of the water wheel is twenty-three $\frac{2\,7}{1\,0\,0}$ feet. The bottom of the water wheel on said lot is below the surface of the ground at the division line between lots No. 1 and No. 2. The fall on lot No. 1, with the advantages of defendants bulkhead is twenty $\frac{8\,9}{1\,0\,0}$ feet. The defendant is the owner and is seised in fee of lot No. 1, and purchased it from Elizabeth Conner and others, devisees of Nanning S. Visscher deceased, and received a deed therefor on the 1st day of July, 1846. This deed after reciting that A⬛h and wife on the 20th of April, 1815, conveyed to Nannin⬛S. Visscher, lot No. 1, with the rights and privileges of 21 feet clear fall of water, and reserving the privilege of roads, &c. as granted by Aikin and Goodman, and the reservations and conditions as to the use of the water and the repairs of the dam, granted and conveyed lot No. 1 and its privileges and appurtenances to the defendant. Said Visscher acquired title to said lot by a deed from William Aikin and wife on the 20th April, 1815. Visscher erected a flouring mill on said lot in 1815, which was used and occupied as such until 1846, when it was destroyed by fire, since which time and previous to the commencement of this suit, defendant had erected another mill thereon and has also erected a new bulkhead and other obstructions on lot No. 1, which are calculated and intended to, and do raise the water higher in the pond and lot No. 1, than it had before been raised on said lot, and which caused the water to set back higher in the said race-way on lot No. 2, than it had ever done previous to the erection of said bulkhead and other obstructions, and thereby retarded the discharge of the water from the plaintiffs' water wheel on lot No. 2, and throwing back the water on to the said wheel to a greater extent and higher than it had been thrown back at any time before, within twenty years previous to the time of the erection of said bulk-head and other obstructions by the defendant." Evidence was introduced by the defendant tending to show that the artificial race-way

Townsend v. McDonald.

through which the water was conducted through lot No. 2, and was discharged on to lot No. 1, had been excavated and deepened, and the plaintiff's water wheel lowered within twenty years. The plaintiff introduced testimony tending to prove the contrary on these points."

The referee found and decided as a fact, that the bulk and head obstructions, aforesaid erected and constructed on lot No. 1, by the defendant after he became the owner thereof, and before the commencement of this suit, raised and set the water back in the raceway on lot No. 2, and upon the plaintiffs' water wheel, so as to materially and injuriously interfere with and obstruct the operation of said wheel and prevent it from moving the machinery of the flouring mill on lot No. 2, and put it in operation, as it would have done except for the flowing, and setting back the water as aforesaid; and that the defendant thus caused said water to flow, and set back as aforesaid, higher than it had been set back into the race-way, and on to the water wheel on lot No. 2, by the owner or occupant of lot No. 1, or by any of them, at any time within twenty years previously to, and immediately preceding the time that the defendant constructed and erected the aforesaid bulk-head, and other obstructions on lot No. 2. That the bulkhead and other obstructions erected and constructed by the defendant, as aforesaid, on lot No. 1, do not and will not flow or set the water back so as to raise it above or higher than the surface of the ground at the division line between lot No. 1 and lot No. 2, as said surface now is or was at that point when said map and partition were made, in 1813. The referee was of opinion that the plaintiffs had acquired a right to the continued use of the water, and a flow of it from their water wheel and race-way, into and upon lot No. 1, in the same manner and at the same height it had been accustomed to flow for upwards of twenty years, immediately before and up to the time of the erection of said bulk-head or obstruction, and as he had found as facts that the erection of said bulkhead and other obstructions by the defendant, did and would interfere with, and interrupt the enjoyment of that right, notwithstanding that said bulkhead and other obstructions would not set the

water back so as to raise it any higher than the surface of the ground at the division line between lot No. 1 and lot No. 2, as it now is or was in 1813, he decided in favor of the plaintiffs, and was of the opinion that they were entitled to a decree perpetually enjoining and restraining the defendant from using said bulkhead and other obstructions in such a manner as to set or flow the water back, and raise it higher in said raceway, upon lot No. 2, than it was set back or flowed and raised by the bulkhead and other obstructions on lot No. 1 for the twenty years immediately preceding the time the defendant erected the bulkhead and other obstructions herein before referred to as having been erected by him. He placed his decision expressly upon the ground that the uninterrupted use and enjoyment by the plaintiffs, or those under whom they claimed, to discharge the water through their race-way on to lot No. 1, at a certain height for upwards of twenty years, conferred upon them the right to a perpetual discharge of said water through said race-way upon lot No. 1, at the same height, and that notwithstanding the other facts proved in the case.

From the judgment entered upon this report the defendant appealed.

*John A. Collier*, for the appellant.

*J. V. L. Pruyn*, for the respondents.

*By the Court*, PARKER, J.   At the time Aikin, Goodman and Dickinson released and conveyed to each other pursuant to the partition made between them, they covenanted that each party should pay his just proportion of the expense of erecting and maintaining the dam, and that neither party should so use the water as to deprive any other party of a just and reasonable participation in its use for mills, machinery, &c. I do not see that this agreement as to using the water, changed the legal rights of the parties. The parties having contributed jointly to the erection of the dam, and having changed the course of the creek, in part at least, by conducting it in a race-way across

Townsend *v.* McDonald.

their lots, the law would secure to each the right to a just and reasonable participation in the use of the water. That right in the owner of each lot was to raise the water by a bulkhead or by machinery or otherwise, as high as the line of property on the stream; not as high as the line of property on the bank. In this respect the race-way was to be treated as a natural stream. Each owner might use the water as it passed over his lot, but not in a way, or to the extent, that would throw it back upon his neighbor above.

The rights of the parties were also liable to be changed, in the same way and under the same circumstances, as in regard to a natural stream. A continued use of the water, by flowing it back upon the lot above, or detracting from the value of its use below, for more than twenty years, would ripen into a legal right, and a grant would be presumed. (3 *Kent's Com.* 440, 447. *Stiles* v. *Hooker,* 7 *Cowen,* 266. *Belknap* v. *Trimble,* 3 *Paige,* 577. *Angell on Water Courses,* § 205.) This rule of law would be equally applicable, whether the rights were originally defined by agreement of the parties, or limited by operation of law. In either case, as the rights might be changed by grant, they will be held to be changed whenever a grant will be presumed.

The application of these principles to the facts before us makes this case a very plain one. The plaintiffs had enjoyed the uninterrupted use of the race-way to a certain extent and in a certain manner, for more than twenty years. A right was thus established, with which the defendant cannot be permitted to interfere; and whatever may have been the original rights of the parties, the erection by the defendant of the bulkhead and other obstructions was an illegal interference with the right of the plaintiffs, so established by prescription.

The referee was therefore right in his decision, and the judgment entered thereon must be affirmed with costs.

[ALBANY GENERAL TERM, December 6, 1852. *Parker, Wright* and *Harris,* Justices.]