Society &c. v. Lehigh Valley R. R. Co.

THE SOCIETY FOR ESTABLISHING USEFUL MANUFACTURES,
appellants,

v.

THE LEHIGH VALLEY RAILROAD COMPANY, respondents.

| 32 | 329 |
| 48 | 451 |
| 32 | 329 |
| e57 | 388 |

1. Estoppels *in pais*, such as have always been known to equity, afford a foundation for a court of equity to enjoin proceedings at law involving such estoppel.

2. It is not every estoppel *in pais* which is available at law as well as in equity, that will have this effect; but when the estoppel grows out of transactions varied in their character and occurring at intervals through a long period of time, which may be available only on equitable terms, it will afford a foundation for equitable intervention.

3. Where a canal company had, for over twenty years, been in the undisputed possession of water, which, before that period, had been in litigation with a riparian owner who knew that the canal company was about to lease its works, which were materially dependent on such water, and such riparian owner took no measures to revive the old litigation, or to give notice of such claims before the lease was given,—*Held*, that ground was laid for the claim of an equitable estoppel in behalf of the lessee, and that he had a sufficient standing in a court of equity to enjoin suits at law calling in question the right to such water.

On appeal from a decree of the chancellor, reported in *Lehigh Valley R. R. Co.* v. *Society &c., 3 Stew. 145.*

*Mr. H. C. Pitney* and *Mr. J. D. Bedle*, for appellant.

*Mr. F. T. Frelinghuysen* and *Mr. T. N. McCarter*, for respondents.

The Society for Establishing Useful Manufactures, the appellant in this court and the defendant in the court below, was incorporated by the legislature of this state by an act passed in the year 1791. The title of this company expressed with completeness the object in view, for the legislative scheme was to encourage and facilitate the foundation of a seat for the manufacture of articles of all kinds for domestic

use, the contemplated capital being large, and the enterprise, on account of its evident utility and magnitude, having a well-founded claim to be considered a matter of public concern.   The franchises and rights granted were valuable and extensive; the charter was perpetual; the original capital a million of dollars, with liberty to acquire and hold personal property to an amount in value not exceeding four millions of dollars; the society being left free to locate itself in any part of the state, the charter containing a provision for incorporating the district so to be chosen, not exceeding six miles square, by the name of "The Corporation of Paterson."   By the second section of the act, the original capital of the company was "to be employed in manufacturing or making all such commodities or articles as shall not be prohibited by law; and, to that end, in purchasing such lands, tenements and hereditaments, and erecting thereupon such buildings, and in digging and establishing such canals, and doing such other matters and things as shall be needful for carrying on a manufactory or manufactories of the said commodities or articles."

The society was speedily organized, and in 1792 a situation at the great falls of the Passaic river was selected as the site of its establishment, and at that point over seven hundred acres of land were purchased, as also the bed of the river both above and below the falls.   A canal or watercourse was constructed, a short distance above the falls, to draw the waters of the river through the lands of the company, which, in connection with a dam thrown across the river, created on the corporate property numerous and convenient water-powers for the use of mills and manufactories.

It will be observed that this charter of the appellant contemplated that the society itself would become a manufacturer, and devote a large part of its capital to that purpose; and at first such was the position assumed by the company, but, failing in that enterprise, the attempt was abandoned, and the numerous water-powers just mentioned were leased out, upon rent, to various individuals and companies.

This was, in general, the situation of the society when, in the year 1824, " The Morris Canal and Banking Company" was incorporated, "for the purpose," in the words of its charter, "of constructing a navigable canal to connect the waters of the Delaware river, near Easton, with the tide-waters of the Passaic river, and passing through the county of Morris." This important undertaking was almost immediately entered upon, and while it was in progress a series of litigations sprang up between these two corporations, which it is necessary to present in their several aspects in order to comprehend clearly the legal attitude of the parties in the case now under consideration.

The first of the suits thus referred to was, in form, a bill in chancery, exhibited in the year 1828, by the Society for Establishing Useful Manufactures, and certain persons, their lessees, against the Morris Canal and Banking Company. The substance of this complaint can be expressed in a few words: After stating the general provisions of its own charter and those contained in the charter of its adversary, it claimed that the society, by its purchase of the bed of the river Passaic and the contiguous land situate at and near the falls, and the appropriation of the water in the manner already described, became entitled to the use of the water of the river flowing in its natural course and condition; that the river Passaic was formed principally by the confluence of three large branches, one of which was called the Passaic, being the main branch, another the Rockaway, and a third the Pompton branch, and that Green pond was a small lake whose waters were carried by Meadow brook into the said Rockaway branch of the Passaic. The charge of threatened injury was, that the canal company had " made preparations to draw the waters out of the Rockaway, at Dover and Powerville and other places;" that " they have constructed works and machinery on the Rockaway near Dover, and have thrown up a dam there and raised the said Rockaway river for the purpose of leading the waters of the said river into their said canal;" that they had " also con-

structed works on the said river at Powerville, about ten miles distant from Dover, for the purpose of carrying the water out of the dam already constructed there, into the said canal," and " gave out, proposed and threatened " to turn the waters of the Rockaway, at both those places, into their said canal; that they likewise threatened to construct " a feeder to the bed of the waters of said Pompton river " so as to lead said waters into their said canal, and, by these means and other works, to divert all of said waters from the lands of the complainant.

In their answer to these charges, the canal company, in substance and effect, said that they admitted the erection and construction of the dams and other erections mentioned, and acknowledged that this had been done " for the purpose of diverting into the bed of their canal such of the said waters as may be necessary in order to carry into effect the object of their incorporation," and alleged that the right to do so had " been openly avowed and asserted at all times." They also admitted that such of the said waters as should be introduced into the canal at or below Boonton, would not, after the completion of the canal, be returned to the Passaic until long after it should have passed the town of Paterson, but they averred that, nevertheless, the quantity of water passing over the said falls, by the natural current of the Passaic and its tributaries, would not be in any degree diminished by the said canal, inasmuch as the waters to be drawn by them from Lake Hopatcong, and also those of one of the head branches of the Raritan river, after passing through and supplying the canal to Dover, would be there let into the Rockaway and would thus introduce to the bed of the Passaic as much additional water as would be afterwards taken from it or from any of its tributaries for the purposes of the canal. The answer then denied that they contemplated or intended to divert those waters to the injury of the complainants, without making adequate compensation for such injury, but they admitted that they had at all times claimed to have a constitutional and legal right

to take and use the waters of the Passaic river and of its tributary streams for the necessary purposes of their said canal, upon making compensation to the owners of such streams as directed by their act of incorporation.

It is proper, also, to state that, in this answer, a letter was set forth from the president of the society, addressed to the president of the canal company, containing expressions showing that, for a considerable period antecedent to the filing of this bill, and during the progress of the building of the canal, the former company had been aware that it was the design to take the waters from these tributaries and to compensate in other water for such abstraction.

This bill and answer having been filed, a motion for an injunction came on for hearing before Chancellor Isaac H. Williamson, who decided such motion against the society, and refused the injunction on the ground that it was doubtful, as the case stood, whether, if the canal company carried their project into effect, there would be any diminution of the water-power, and that consequently it was not certain whether the complainant will, in point of fact, sustain any injury. The chancellor said that " the route of the Morris canal has long since been known to the society, large sums of money have been expended and the canal is now in a great state of forwardness. Under these circumstances, it would not, I think, be a sound exercise of discretion for the court to interfere, on the ground of apprehended danger." The chancellor also remarked that the letter of the president, just alluded to, was a circumstance of " considerable weight," in his mind.

Some time after this decision, a second application for an injunction, founded on this original bill, appears to have been made, which resulted in a like rejection of the application, accompanied with a suggestion that, as subsequent occurrences were relied on, there should be a new bill.

Accordingly the litigation assumed the form indicated by the chancellor, a new bill being filed in the month of January, 1830, which was in effect a transcript of the original

bill, with an addition charging that the waters in dispute had, on a certain occasion, been diverted into the canal, and that such diminution had not only been perceptible at Paterson, but had, to a material degree, impaired the water privileges of the complainant at that place.  It also charged, additionally, that this mixing of the water taken from the tributaries of the Passaic, which have been already designated, with the water legitimately belonging to the canal company, was an illegal act as against the complainant, and that it was impossible for the society to ascertain how much water the canal company brought down from Lake Hopatcong " and how much they took out of said tributary streams, and that all intermixture of the waters of different streams, flowing naturally in different directions, and thereby diverting the waters of such streams from their natural courses, was further calculated to involve the rights. of individuals to the flow of the respective waters of the different streams in uncertainty and confusion, and was, therefore, illegal and unconscientious."

The answer to this bill was likewise in substance a copy of the answer to the original bill, with the difference that it contained explanations or denials or traverses of the new matters just referred to.

The motion for an injunction, founded on this bill, was heard by Chancellor Vroom, and the proceedings are reported in full in *Sax. 157*.  The fate of the application was similar to that of the preceding one, the direct point decided being that the intermixture of waters complained of was not, *per se*, illegal, and could not be the ground for equitable relief unless it appeared, in a satisfactory manner, that the water given in return for the water so withdrawn, was not fairly compensatory.  This right to intermix these waters, and which right was sustained, is thus stated in his opinion by the chancellor.  Referring to the canal company, he says :  " They claim, under the act of incorporation, the right to construct a navigable canal from the Delaware to the Passaic.  They claim the use of the waters of Lake.

Hopatcong, and of the extra water of Green pond. They claim to bring the water from the Hopatcong into the Rockaway—to make use of that river as a part of the canal, and to take out of it again water for the use of the canal—not thereby diminishing the ordinary and natural flow of the water at the great falls at Paterson." Having legalized by his judgment this claim, and then concluding that it was not sufficiently shown that the water at the establishments of the complainant was diminished, an injunction was refused.

The litigation then in its next grade assumed a new form. There appears to have been a lull for several years, and the circumstances that occasioned its revival were these:

In the month of January or February of the year 1836, the Morris Canal and Banking Company being desirous of increasing the number of its feeders, reservoirs and other works, applied to the legislature for the requisite addition to its franchises and powers, and such application being opposed by the society, this situation led to an amicable adjustment of the hostile interests, such adjustment taking the form of a contract between these rival companies. This agreement in a preamble recites that certain controversies had arisen between these corporations in relation to the use of the waters of the Passaic, the society alleging that the Morris Canal was diverting the waters of some of the tributaries of such river so as greatly to diminish the water at Paterson in times of drought, of which the society claimed the exclusive use, and which allegation was denied by the canal company, and states that, in order to terminate such matters in difference, it was covenanted and agreed in substance that the said canal company would discharge from its canal, through a certain designated basin near the falls at Paterson, a certain quantity of water, and in consideration thereof the canal company was to have the right to make and avail itself of all reservoirs on the head-waters of any of the tributary streams of the Passaic river, and to divert the same, and to use the waters thereof as it might think

proper. This compromise having been thus effected, and the opposition in the legislature withdrawn, the canal company obtained the additions to its corporate franchises which it needed. The proper basins, gates and other necessary structures were erected, and the quantity of water as stipulated was furnished to the society.

The amity thus established appears to have remained undisturbed for the period of about nine years, when, in the summer of 1845, the litigation was renewed. During this interim the property and franchises of the Morris Canal Company had been sold under a foreclosure bill, and had passed into new hands. The mortgage under which this transfer had been effected was prior in date to the agreement, just described, between these two companies, and the new canal company deeming itself to hold under a title paramount to it, refused to be bound by its stipulations, and in pursuance of such a view of its rights, proceeded to put up a structure so as to cut off the water flowing from the canal into the Passaic, as provided for in the contract. This structure having been demolished by the society, it was rebuilt by the canal company, and, to protect it, a bill was filed in chancery, and an injunction obtained. This was in August, 1845.

This bill of the canal company was met on the part of its adversary by an answer and cross-bill, which, with respect to their statements of law and fact, were, in all material matters, alike. In these pleadings, the society narrated again the history of the original invasion of its rights by the canal company in diverting the before-mentioned tributaries of the Passaic, referred to the former litigation, and their compromise in the year 1836, setting out *in extenso* the agreement of that period. It was then alleged that the canal company having, by reason of the withdrawal of the opposition of the society in the legislature, obtained a large augmentation of its powers, had made " a large reservoir at Long pond, and constructed a feeder at Pompton, which extended to said canal and took into their said canal, by one or more dams,

Society &c. *v.* Lehigh Valley R. R. Co.

all the waters of the Pompton river and all its tributaries, in the same manner as they had previously done with the waters of the Rockaway," leaving the society " no remedy except by the agreement before recited." It was also insisted that the society was not affected by the foreclosure under which the canal had been sold, as they were not parties to that suit, and as notice of the existence of their rights had been given at the master's sale in that proceeding. The cross-bill charged that, as the canal company claimed and used the benefits of the before-mentioned agreement, they could not refuse to be bound by it, and the prayer was that the agreement might be established, or, if the court should be of opinion that they were not bound by it, then that they might be restrained from diverting in anywise any of the waters of the Passaic river and of the streams of water tributary thereto, and from using the reservoir at Long pond, and from taking the waters of the Rockaway and Pompton rivers into their canal. There was also a prayer for an account for damages and for further relief.

Such was the clearly marked attitude of the society, and the position of their opponent was equally clear and definite, as is manifest from the answer filed by them to the cross-bill. This latter pleading was filed in December, 1847, and in it they admit the diversions of water as complained of, and say it was " for the purpose of diverting into the bed of their canal such of the said waters as may be necessary in order to carry into effect the objects of their incorporation, and that their right to do so has been openly avowed and asserted at all times." They deny that the notices that the society may have given of their asserted rights, could have any effect in depriving them of their right to the lawful use of such waters as was necessary for their canal, and assert that the correct position is, that it was competent for the legislature to authorize them to take the said waters, should the same be necessary for the purposes of the canal, they making compensation therefor. They deny that they diminish the water flow at Paterson, and insist that the

22

agreement, on various grounds, is not binding on them. They then aver that they " never contemplated or intended to divert the waters of the Passaic river to the injury of the complainants, and never claimed any right to divert such waters without making adequate compensation for such injury, but they admit that they have, at all times, claimed to have a constitutional and legal right to take and use the waters of the Passaic river and of its tributary streams, for the purposes of their said canal, should it become necessary to take the same, and if taken without injury to others, and even to take such waters as were used by others, upon making compensation to the owners of such streams, as directed by the said act of incorporation." They also allege that, by their charter, adequate provision is made for ascertaining and securing the payment of any injury and damage that might be sustained by the owners of lands, waters and streams required for the purposes of the canal.

These several contestations coming for decision before the chancellor on an application for an injunction on the cross-bill, and to dissolve the injunction then in force against the society, both motions were refused. This adjudication occurred in December, 1845, before the filing of the answer to the cross-bill, such answer being filed in December, 1847. From this date until the month of September, 1876, when the first of the actions at law, which the bill now pending restrains, was brought, no further litigation appears to have existed on the matters above stated, between these companies. The suit thus enjoined was brought by the society against the respondent, in the supreme court of this state, and the ground of complaint, as stated in the declaration, was for cutting off the before-mentioned tributaries of the Passaic, the Pompton and Rockaway branches, and was thus manifestly for the same alleged invasions of the water privileges of the appellant as had been and were embraced in the series of litigations which I have found it necessary to state with so much particularity. A second suit, resting on the same foundation, has been instituted.

The bill in the case now pending in this court, was exhibited to prohibit these legal proceedings.  In it the Lehigh Valley Railroad Company, the lessee of the Morris Canal and Banking Company, is the complainant, and the Society the defendant.  It consists, in the main, of a history of the above-mentioned litigations between the society and the canal company, and in a re-affirmation of the legal positions in such procedures which had been asserted by the latter company, but it likewise contains certain new facts which appear to be deemed circumstances creating equities in favor of the case of the appellants.  Among these are acts alleged to have been done by the appellant, disabling it from carrying out the contract of the year 1836; the acquisition, in the year 1867, by the canal company, of additional franchises, the expenditure of vast sums of money in the improvement and enlargement of their works, and which outlay would not have been needed if they were not authorized to use the waters of these tributaries of the Passaic; that the appellant, the Lehigh Valley Railroad Company, in the year 1871, by legislative authority, leased, in perpetuity, for a certain specified rent, the "entire canal and navigation works" of the canal company, and that such lease, and the legislation on which it was founded, was acquired with the knowledge and acquiescence of the appellants, and without any intimation of the rights in these waters now claimed by them, such conduct being presented as an equitable estoppel, and they also insist that the great length of time that has been suffered to elapse since the former suits, has a similar tendency.  The prayer is, that the respondent may be protected in the enjoyment of its canal and the waters of the Rockaway and Pompton rivers, and the other tributaries of the Passaic, in the same manner and to the same extent as the Morris Canal Company, the lessors of the respondent, used and enjoyed the same, and that the appellants may be perpetually enjoined from prosecuting their suits at law.

The bill was likewise answered by the society, such answer being principally composed of a narration of the various antecedent litigations, the legal points decided in them, and claiming that the rights of the appellants to the water of the Passaic, without diminution, was in the entire course of such proceedings admitted by the canal company as well as adjudged by the court.

On the filing of this last bill an injunction was granted, restraining the above-mentioned suits at law, and which, on a motion to dissolve it, made before the chancellor, was decreed to stand. This is the decree appealed from.

The opinion of the court was delivered by

BEASLEY, C. J.

Under these conditions of this controversy the single question to be decided on this appeal is, whether the appellant has a right to proceed at law on the ground of this alleged invasion of its right to these waters in dispute, or must, under compulsion, seek redress in equity.

In entering upon this inquiry it is important to present to our minds, in a distinct and definite form, the question to be decided. That question is, whether this corporation can be compelled, against its will, to come into equity for relief against the wrong of which it complains. That wrong is, that being the riparian owner of certain lands through which a natural stream flows, a portion of such water has been diverted to its injury by the illegal act of the respondent. Such a cause of action being a legal one, unless from the presence of jurisdictional equities in the case, the appellant has a clear right to pursue his remedy before a common law court. In this case, this respondent, standing on such right, was urging its suits before such a tribunal. The question consequently is, whether it can be stopped in such pursuit by the hand of the chancellor. Such a prerogative manifestly depends on the existence, in the facts involved, of some equitable circumstance which, according to estab-

lished rules, justifies the transfer of the suits at the request
of the defendant in the actions at law, from the legal to the
equitable forum. When, therefore, we shall have ascer-
tained whether such equitable feature exists or not, the
problem before us will be solved.

I cannot think that, because the questions involved in this
controversy are of magnitude, or are intricate, or difficult
of solution, that therefore the courts of law can be divested
of their jurisdiction over them. It does not appear that the
importance of the matters in dispute has ever been regarded
as affording any test of the cognizance of a court of equity.
The claim, if admitted, would confer upon the court of
chancery a prerogative jurisdiction over the entire field of
all momentous and obscure controversies. No decision, so
far as is known, has ever gone on such a principle. Nor is
it perceived how such a jurisdiction can arise, because the
suit relates to corporate franchises. When a corporation,
under a legislative grant, claims the right to divert a nat-
ural stream away from a riparian proprietor, the matter in
issue is purely a legal question, and it seems indisputable
that, under ordinary circumstances, the person injured can
pursue his remedy in an ordinary action at law, and such
action, in the absence of qualifying conditions, is not amen-
able to equitable control.

Neither have I been able to discover a ground for equi-
table intervention in such cases, because of the principle
that when several persons are entitled to the use in common
of a stream of water, the distribution among them of their
respective shares is an equitable function. That a court of
equity has jurisdiction in such cases is undeniable, and in
the present case, if either the appellant or the respondent
had applied for relief and a regulation of its right, to the
court of chancery, there would appear to be no doubt of the
right of such tribunal to take the controversy in charge.
Such were the cases of *Belknap* v. *Trimble, 3 Paige 577 ;
Ballou* v. *Inhabitants of Hopkinton, 4 Gray 324 ; The Boston
Water Power Company* v. *Boston &c. Railroad, 16 Pick. 512.*

In all these cases the equitable jurisdiction was undoubted, as it was invoked by the party injured. In such cases courts of equity and those of common law have concurrent jurisdiction, and consequently the complaining party may seek either forum. That his relief may not be as complete in the forum which he chooses, as it might have been in another forum, is a matter for his own consideration, and not for that of his adversary. The power to take charge of the given case being co-ordinate, neither court can assume a paramount authority and compel an unwilling suitor to come to it for protection. In the case of *The Delaware, Lackawanna and Western Railroad Co.* v. *The Erie Railway Co.*, *6 C. E. Gr. 298*, the party injured voluntarily came to the court of chancery for relief, and consequently that precedent has no application to the question under consideration. In the present case, if this appellant, instead of suing in the supreme court, had filed its bill in the court of chancery, the jurisdiction of the latter tribunal would have been indisputable; but this conclusion has but little tendency to show that these suits at law can be transferred to equity at the instance of the defendant in the legal proceedings.

Nor have I found any authority for the doctrine that equity should intervene in this case in order to avoid that multiplicity of suits that would be incident to the continuance of the legal jurisdiction. The rule is entirely settled, that in case of private nuisances, the person injured may vindicate his rights by repeatedly suing the wrong-doer in a court of law. The point is too clear to be discussed.

The consequence is, that on none of these grounds can the decree in question be vindicated.

There is, however, another jurisdictional claim which remains to be examined.

This claim grows out of the alleged existence in the case of certain circumstances which, it is contended, constitute an equitable estoppel.

The facts embraced in this contention are those that relate to the acquisition by the present respondent of the

property of the canal company. In this connection the present bill alleges that when the lease to the respondent was in contemplation, and when the Morris Canal and Banking Company was making application to the legislature for the requisite authority, and while the matter was pending, to the knowledge of the appellants, the governor of the latter company had a conference with the officers and agents of the canal company, and, at the request of such governor, a proviso was inserted in the clause of the act granting the right to lease the canal, which was in the following words: "And provided further, that nothing herein contained shall be held to authorize the said company, or its lessee or its lessees, to do any act affecting the existing rights of the Society for Establishing Useful Manufactures." And the bill then avers that the society did not inform the canal company or the respondent that the old claim attempted now to be revived by the suits at law, was deemed to be one of such existing rights. The respondent also asserts that if it had been notified of such claim before the execution of the lease, such instrument would not have been taken until such claim had been settled. The appellant admits that it knew of the intended passage of the act, and procured the proviso to be inserted, and also admits that it did not give any notice to the canal company or to the respondent, of the rights now claimed and sought to be enforced.

In endeavoring to measure the equitable effect of this situation, it is of the first importance to bear in mind that, from the beginning and all through the progress of the series of litigations which have occurred, it has ever been claimed and asserted by the Morris Canal and Banking Company that the possession by it of the waters in dispute was not only a convenience, but something very like a necessity, to the successful operation of its canal. That such right was and it is of great moment to this company, is perfectly conspicuous. The important consequence, therefore, follows, that the appellant is chargeable with the knowledge

that the fact of its intention to deny the existence of such
right, was a circumstance of the greatest interest to any
person having in contemplation the leasing of the works of
the canal company.   With such consciousness it acquiesced
in the passage of the act authorizing a lease to be made,
contenting itself with annexing a monition that such law
was not to be construed as empowering the canal company
" or its lessees, to do any act affecting the existing rights
of the society."   Obviously, this proviso relates to the future
and not to the past, and guards not against illegal acts
already done, but against the possibility of the statute being
made a ground of infringing, by some act thereafter to be
done, the rights of the society.   So, too, it is plain that the
terms " existing rights " were in nowise indicative that this
company intended to claim the water rights in question.
There is certainly, therefore, a fair ground here laid for
charging that this appellant acquiesced in this law, and, with
the knowledge that a lease was about to be made, failed to
give notice, either directly or by bringing suit, or putting
existing suits in motion, that after such lease should be exe
cuted, it was its intention to set up that the lessee would not
be entitled to these essential water privileges.

But it is said, in the logical and learned brief of the coun-
sel of the appellant, that the duty of inquiry as to the title
and rights of the lessor, was, upon general principles,
devolved upon the lessee.   This is undoubtedly so.   The
cases cited in the brief are authorities to this effect, and the
rule is so well established that it is not necessary to look
into its foundation.   But in the present case it is far from
clear that the appellant is not chargeable with knowledge
that, under the conditions of things then existing, such
inquiry, made with ordinary diligence and upon ordinary
rules, would have failed to discover the claims which the
appellant is now insisting on.   If the respondent, at the
time of taking its lease, had investigated, what would it
have discovered ?   It would have ascertained that for over
twenty years the canal company, from whom it was about

to take title, had been in the undisturbed possession and enjoyment of the water rights in question, and that during that long period of time such company had, to all appearances, as of right, used such privileges; that, also, during such interval of time, it had, from time to time, as occasion required, greatly enlarged and improved its works, apparently to a great degree relying on the fact of being the rightful owner and possessor of such water rights. This is the result to which inquiry would have led, and it may reasonably be charged that the appellant was aware that such would be the result.

In the argument of the counsel of the appellant, it was claimed that the obligation to make an inquiry more extended in point of time than this, was imposed by law on the respondent, for it was assumed that the respondent, as a matter of course, would have ascertained, in the exercise of a due diligence, the records of the ancient litigations between these parties. But is not such a position of uncertain tenability? The appellant, in its answer, refuses to treat those suits as *lites pendentes*, but says that, having served their purpose, they were mutually abandoned. The inquiry, therefore, arises, whether, according to any known practice, this respondent can be required to have searched for these time-worn litigations which had then been laid aside and relinquished for more than twenty years. It is manifest the point is worth a careful consideration.

But again, on the hypothesis claimed, and on the assumption that the respondent had ransacked these records, and is, therefore, to be held responsible for the knowledge thus acquired, what would be the position of the equities of this branch of the case? It is said that the respondent would thus have known that the society was entitled to the rights of a riparian owner in the waters in dispute, and that the court of chancery had so adjudged, and that the lessor of the respondent had never disputed them, but had merely denied that its works occasioned any diminution of such water. In short, the contention is, that the respondent would

thus have been informed that, at all times, the canal company had admitted the rights of the appellant, as now claimed, and that, in the language of counsel, "the canal company had always disavowed any right to divert the waters of the Passaic.' But it seems to me that this statement, as an expression of the attitude which had always been assumed by the canal company, is imperfect, as it leaves out an essential element of the claim actually made by such company. That claim, it is true, involved an admission of the riparian rights of the appellant, and a denial that the use of the water made by the canal company injuriously impaired such rights; but, at the same time, it asserted the existence of a paramount right in the canal company, by virtue of its charter, to take and retain such waters. In the answers filed by it, it virtually said, "I take this water of right; I deny that you are injured; if you deem you are, my charter gives you a right to claim compensation by suit." This, certainly, gives quite a decided aspect of hostility to the claim made to these waters; and, consequently, the question that would here arise would be, whether the respondent, the lessee of the canal company, with a knowledge as to such an attitude of its lessor, and of an apparent submission to such claim for over twenty years by the appellant, had not the right to conclude that the contest for these waters had been entirely abandoned by the latter company.

In addition to these features of the case it should likewise be remembered that, for six years after the execution of this lease and possession of the canal had been taken under it, the respondent was suffered to proceed under such lease and make large outlays of money and incur many obligations of great magnitude, without receiving any intimation from the appellant of its present momentous claim.

It would not be proper, at this stage of these proceedings, to decide definitively that the foregoing circumstances constitute inevitably an equitable estoppel, for such circumstances may be deprived of some of their intrinsic force from

Society &c. v. Lehigh Valley R. R. Co.

other facts which the case embraces and which will be more fully developed in the progress of the suit; but it seems to me that, as matters now stand, it cannot be denied that substantial ground is here laid for a claim on the part of the respondent that an equitable estoppel against the further prosecution of the suits at law, is manifested. On such an admission the right of a court of equity to intervene and to put an end to the legal actions, is undoubted. Such a power is one of the original and inherent prerogatives of the jurisdiction of a court of conscience. Nor can the circumstance that estoppels of this character are now, in a degree, given effect to in the common law courts, affect such equitable jurisdiction, for it is the well-settled rule that such a jurisdiction cannot be taken away in such an incidental manner. The rule is stated by Judge Story and other text writers, and is so familiar that I shall cite no authorities in its support. It is true that the doctrine of estoppel *in pais* has been, by the modern decisions, so greatly enlarged as now to embrace many acts and conditions of affairs which were originally unknown to it, many of such facts and conditions being of a character so definite and simple, and being purely defensive in their nature, as to be susceptible of being readily dealt with at law, and it may well be that some of such novel defences will not afford a foundation for equitable jurisdiction. But with respect to estoppels seated in such considerations as are above indicated, there can be no question of their jurisdictional capacity, as they plainly belong to the class that have been always cognizable in a court of equity. That when an estoppel of this kind exists against the claim set up at law, a court of equity has the competency to assume control over the case, is evidenced fully by the precedents, both ancient and modern. In the case of *Short* v. *Taylor*, briefly reported in *2 Eq. Cas. Abr. 522*, the facts are thus stated: "Short built a house; Taylor began to build another, but laid part of his foundation on Short's land. Short, seeing this, did not forbid him, but, on the contrary, very much encouraged it; and when the house

was built he brought an action," and Lord Somers granted an injunction and said it was just and reasonable. There is another case, reported in connection with this, in the same work, and which is to the same purpose. And it was principally upon the authority of these two cases that Lord Cottenham granted a similar injunction in the case of *Williams* v. *Earl of Jersey, 1 Cr. & Ph. 95.* Referring to these authorities he says : " I think it impossible, after those two cases, to say that a party may not so encourage that which he afterwards complains of as a nuisance, as not only to preclude him from complaining of it in this court, but to give the adverse party a right to the interposition of this court in the event of his complaining of the nuisance at law." These cases are sufficient to exemplify the principle above stated, that when, from equitable considerations of a certain character, it would be unconscientious in a litigant to prosecute a claim, and such party is striving to do so in a suit at law, a proper ground is afforded for enjoining such legal proceeding. On this foundation I think the chancellor was authorized to proceed as he has done, and to require this controversy to be settled in his court, where alone it is plainly evident that it can be properly investigated and decided.

For affirmance—BEASLEY, C. J., DEPUE, REED, SCUDDER, CLEMENT, DODD, WALES—7.

For reversal—DIXON, KNAPP—2.